624 A.2d 1328

Aron **GOLDBERGER**

v.

Esther **GOLDBERGER.**

No. 1395, Sept. Term, 1992.

Court of Special Appeals of Maryland.

May 28, 1993.

**316**

William T. Kerr (Bregel, Kerr, Davis & Dantes, on the brief), Towson, for appellant.

Bruce A. Kaufman and Christopher L. Panos, Baltimore (Susan Carol Elgin, Towson, on the brief), for appellee.

Argued before WILNER, C.J., BISHOP, J., and DANA MARK LEVITZ, Judge Specially Assigned.

DANA MARK LEVITZ, Judge Specially Assigned.

The odyssey of the young children of Aron and Esther Goldberger has led them from Lakewood, New Jersey, to Israel, to Belgium and England, and finally to Baltimore, Maryland. These children have been the subject of the attention of various courts including: The High Court of Justice, Family Division, London, England; the Ecclesiastical Court of the Chief Rabbi of London (Beth Din); and, finally, the Circuit Court for Baltimore City.

Prior to the trial of this matter before the Circuit Court, the parties and their children had been examined and evaluated by ten physicians or psychologists. When the trial began, Esther and Aron Goldberger were fighting only about the custody of their children and related matters of support and visitation. Allegations of sexual child abuse, kidnapping, insanity and unfitness were made by one or the other of the parents. Other extended family members were brought into the conflict and took an active part in it. Since both parties are devout Orthodox Jews, noted Rabbis in this country and in Europe and Israel were consulted by the parties for advice, guidance and support.

After resolving the pre-trial motions, participating in pre-trial conferences with the attorneys and the parties, and conducting a four day trial, the Court divorced the parties and determined that Esther Goldberger should be the custodian of the children: Chana Frumit, age 11; Mamele, age 10; Meir, age 9; Chaim Tzvi, age 7, Eliezer, age 6; Yaacov, age 3. The Court further ordered that visitation with Mr. Goldberger take place only under supervised conditions in the presence of professionals. Further, in determining the issue of child support, the Court found that Mr. Goldberger had impoverished himself voluntarily and that his potential income was $60,000 per year. The Court ordered him to pay $4,066.00 per month in child support for the six children.

Mr. Goldberger appeals. Interestingly, he does not directly allege that the Chancellor erred in determining that it would be harmful to these children to be in his custody. Nor does he challenge directly the necessity for any visitation to be closely supervised. Instead, he raises two questions in his appeal to this Court:

(1) Did the trial court err in attributing $60,000 earning potential to Appellant, based solely upon the ability of others to raise funds to finance his custody litigation?

(2) Whether the trial court's refusal to recuse itself was clearly erroneous where trial court manifested clear prejudice to Appellant prior to trial, or in the alternative, violated Appellant's rights to due process of law?

### Recusal

Were this Court to agree that the Chancellor abused his discretion in not granting appellant's recusal motion made on the first day of trial, the entire decision of the Chancellor would have to be set aside and a new trial ordered. Accordingly, we shall address this issue first.

The Court of Appeals has recently reiterated that judges are impartial participants in the legal process, whose duty to preside when qualified is as strong as their duty to refrain from presiding when not qualified. *Barry Jefferson El*

*v. State,* 330 Md. 99, 622 A.2d 737 (1993); citing *Boyd v. State,* 321 Md. 69, 581 A.2d 1 (1990); *Doering v. Fader,* 316 Md. 351, 558 A.2d 733 (1989). A fair and impartial trial is a judicial process by which a court hears before it decides; by which it conducts a dispassionate inquiry and renders judgment only after receiving evidence. *Spence v. State,* 296 Md. 416, 463 A.2d 808 (1983). Unquestionably, cases involving innocent children who are caught up in ugly and divisive disputes between their parents are some of the most difficult that trial judges are called upon to decide. These cases sometimes require extraordinary effort to remain dispassionate, particularly when it becomes clear that a party has acted unreasonably to the detriment of the children.

■ Recusal is a discretionary matter, and the judge's decision denying recusal should not be overturned unless clearly wrong. *Surratt v. Prince George's County,* 320 Md. 439, 578 A.2d 745 (1990); *In re Turney,* 311 Md. 246, 533 A.2d 916 (1987). In the case *sub judice* there is no question that it was up to the trial judge to decide the recusal motion. No allegations of bias derived from an extrajudicial source are alleged. Nor were there any allegations of personal misconduct such as those alleged in the *Surratt* or *Turney* cases.

■ The appellant argues that "the content of the pre-trial proceedings in this case permanently tainted and polluted the remainder of the case." Where the bias of a trial judge against a party is alleged as the basis for recusal, the bias must have derived from a "personal," rather than judicial source. *Boyd v. State,* 321 Md. 69, 581 A.2d 1 (1990). Where knowledge is acquired in a judicial setting, or an opinion expressing bias is formed on the basis of information acquired from evidence presented in the course of a judicial proceeding before that judge, neither that knowledge nor that opinion qualifies as "personal." *Boyd v. State,* at 77, 581 A.2d 1; *Doering v. Fader,* 316 Md. 351, 356, 558 A.2d 733, 736 (1989).

The trial judge's first contact with this case came in the first week of March, 1992. Having just rotated into the domestic

assignment,[1] the court noted that a four day trial was scheduled for this case to begin the end of the month. The court reviewed the file and noted that seven other judges of the Circuit Court for Baltimore City (nearly 30% of the Bench) had been involved in this case. To assure consistency, the trial judge requested the Administrative Judge to assign the case to one judge for all pending motions and trial. Based on that entirely proper request, the case was assigned to the trial judge to handle all further matters.

A pre-trial conference was scheduled on March 4, 1992. Subsequent pre-trial conferences were held on March 5, 9, 11 and 13. It was at one of the pre-trial conferences that the court was made aware of the fact that appellant had failed to pay any child support in spite of agreeing to pay same. He was $3,000 in arrears. Also, appellant had failed to pay one-half of the fee of Dr. Lehne, the court-appointed mental health expert, or one-half of the fee of counsel for the children. Also, the court learned that appellant had avoided the effect of a previous court order to surrender his passport to counsel by applying for a duplicate passport, falsely claiming that the previous passport was lost.

At the first pre-trial conference, the court requested that the parties submit a list of proposed witnesses and a summary of their testimony. At the pre-trial conference of March 11, 1992, the court indicated that it would not permit either side to call any of the numerous witnesses the parties proposed because it appeared from the summaries that those witnesses, other than the experts, could provide only anecdotal information that would be of little assistance to the court. This ruling was reversed on March 13, 1992. On that day, the court told the parties at a chambers conference that each party would be permitted to call any and all witnesses he or she desired and that no witnesses were being precluded from testifying. Also at this conference, it was agreed that the court-appointed experts, Dr. Gregory Lehne and Dr. P. Gayle O'Callaghan,

---

1. It is the practice of the Circuit Court for Baltimore City to rotate judges among the various divisions of the court for six month periods.

would be called by counsel for the children. At the trial, which began on March 31, 1992, the court permitted the parties to call the witnesses they desired.

Undeniably, some of the statements the trial judge made during the various pre-trial conferences clearly revealed the court's displeasure with the conduct of appellant. Also obvious is the fact that the trial judge was attempting to encourage the parties to settle their dispute for two compelling reasons: first, because the unanimous opinions of all of the experts were that custody must be awarded to the appellee; and second, because of the sensitive and potentially embarrassing nature of likely trial testimony. Although experienced trial judges know the value to the parties of settlements in domestic cases, the fact is that some litigants need their day in court. That they are entitled to it cannot be denied. *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972).

Some of the comments of the trial judge regarding appellant were injudicious. Statements regarding appellant's possible (but uncharged and unadjudicated) perjury in his passport application and his disqualification as a witness were unnecessarily harsh.[2] More egregious were the court's pre-trial comments indicating that no witnesses would be heard other than the parties.[3] The trial court's function is to hear witnesses. *Spence v. State*, 296 Md. 416, 463 A.2d 808 (1983). While appellant's failure to pay child support and fees of the experts and counsel for his children, to which he had agreed, was inexcusable, the court's threatening comments regarding leg irons and handcuffs were improper.

---

2. The court did not actually limit the appellant from testifying in any way.

3. As noted, approximately three weeks prior to trial, when it became clear that a settlement was not possible, the court told the parties they would be permitted to call all of their witnesses.

█ The Court of Appeals in *Jefferson–El v. State*, 330 Md. 99, 622 A.2d 737 (1993), recognized that recusal may be required not only when the trial judge has an actual personal bias against a party, but also when the trial judge creates a situation in which it would appear that he could not, with impartiality, preside at the subsequent trial. It is the appearance of impropriety that requires the judge to be recused.

At the hearing on the recusal motion, heard at the beginning of the first day of trial, the court commented on the allegations made by appellant regarding the court's personal animosity and misconduct. "I'm kind of amused by that because the only thing I haven't been accused of is prejudging the major issue before the court. The major issue before the court is the best interest of these children."

In his concluding comments regarding the recusal motion, the trial judge stated,

> The critical issue in the case is the best interest of the children and Mr. Goldberger has not been denied a single right to present evidence on that issue. And the court has not made a ruling on that issue because I haven't heard the case. . . . Whatever the truth is, hopefully, it will come out during the course of this hearing. The motion to recuse is denied.

█ As we observed earlier, no complaint is made about the conduct of the trial or the judge's demeanor during the trial. Nor does appellant suggest that the evidence was in any way insufficient to sustain the court's custody decision, or that the decision was based on anything other than the evidence. The fact of the matter is that, in light of the evidence presented, no reasonable fact finder could have resolved the question of custody differently than the Chancellor did in this case.[4] All of the expert witnesses, including those consulted by appellant and called by him to testify, agreed that appellant was a

---

4. Both the Ecclesiastical Court of the Chief Rabbi of London (Beth Din), which conducted an extensive three month trial, and the High Court of Justice, Family Division, London, England, determined that custody should be granted to appellee.

troubled man with serious personality disorders. All experts, including those consulted by appellant and the Court, agreed that it would be harmful to these children if appellant were awarded their custody. We are not prepared to say that, given the unique facts of this case, the Chancellor's refusal to recuse himself constituted an abuse of discretion or prejudiced appellant.

## Child Support

In the case *sub judice,* the evidence revealed that appellant was 32 years old and healthy, with many years of higher education. It was undisputed that appellant had earned no actual income, as he had never worked at any income-producing vocation. Appellant planned his life to be a permanent Torah/Talmudic student.[5] He was a student before he was married and before any of his children were born. Appellant testified that he studies "for the sake of studying, which is a positive commandment to study the Torah for the sake of studying it." Further, appellant testified that it was his intention to continue his life of study forever: "... I should continue to study the rest of my life, to always be in studying ..." Throughout his life appellant has been supported by others, first, his parents, thereafter, his father-in-law, and most recently, friends in the Orthodox community. Nevertheless, appellant fathered six children whom he has refused to support, arguing that he has no means to support and never will have the means to provide support.[6]

---

5. The Torah is the "fundamental" law of the Jewish people. It consists of the five books of Moses (the Pentateuch): Genesis, Exodus, Leviticus, Numbers and Deuteronomy. It is considered to be of divine origin. The Talmud is an exposition of the fundamental oral and written law. It contains the rabbinic interpretation of the "fundamental" and "common" law.

6. Rabbi Jacob ben Asher (1270–1340), known as the "Ba'al Ha Turim" and considered one of the great authorities on Jewish Law, stated in his authoritative digest, "A man can be forced to work in order to maintain his wife and infant children." Tur, Even Ha'ezec 70. Horwitz, *Spirit of Jewish Law.* Central Book Co. 1973.

A life devoted to study is viewed by many in the Orthodox community as a true luxury that very few can enjoy.[7] Unfortunately for the appellant's children, permanent Torah/Talmudic students must depend on the charity of others to provide the necessities of life. Those who support a Torah student have no legal obligation to continue such support in either duration or amount.

Nevertheless, through a network of family and Orthodox communities in Europe and the United States, approximately $180,000 had been contributed to appellant over a three year period to enable him to pursue his custody claim. Approximately $3,000 of that sum was once used to purge appellant of contempt for failing to pay child support.

Based on these facts, the court determined (1) that appellant had voluntarily impoverished himself, and (2) that his potential income was equivalent to the money that had been contributed by others to his cause. It therefore regarded his income, for purposes of paying child support as $60,000 per year and ordered that he pay $4,066 per month for the support of his six children. Appellant challenges both the finding of voluntary impoverishment and the calculation of potential income.

The obligation of parents to support their minor children has been consistently upheld by the Court of Appeals of Maryland. *Middleton v. Middleton,* 329 Md. 627, 620 A.2d 1363 (1993) *Carroll County v. Edelman,* 320 Md. 150, 170, 577 A.2d 14, 23 (1990); *Knill v. Knill,* 306 Md. 527, 531, 510 A.2d 546, 548 (1986); *Bledsoe v. Bledsoe,* 294 Md. 183, 193, 448 A.2d 353, 358 (1982); *Kerr v. Kerr,* 287 Md. 363, 367, 412 A.2d 1001, 1004 (1980); *Brown v. Brown,* 287 Md. 273, 281, 412 A.2d 396, 400 (1980); *Rand v. Rand,* 280 Md. 508, 510, 374 A.2d 900, 902 (1977); *Speckler v. Speckler,* 256 Md. 635, 637, 261 A.2d 466,

---

**7.** Even Teveya, the fictional lead character of *Fiddler on the Roof,* recognizes that a life of study is a luxury when he sings, *"If I were a rich man....* Wouldn't have to work hard.... I'd discuss the Holy books with the learned men seven hours every day; that would be the sweetest thing of all."* (Emphasis added).

467; *Johnson v. Johnson*, 241 Md. 416, 419, 216 A.2d 914, 916 (1966); *Bradford v. Futrell*, 225 Md. 512, 518, 171 A.2d 493, 496 (1961); *McCabe v. McCabe*, 210 Md. 308, 314, 123 A.2d 447, 450 (1956); *Kriedo v. Kriedo*, 159 Md. 229, 231, 150 A. 720, 721 (1930); *Blades v. Szatai*, 151 Md. 644, 647, 135 A 841, 842 (1927). In *Carroll County v. Edelman, supra*, the Court stated,

> Parenthood is both a biological and a legal status. By nature and by law, it confers rights and imposes duties. One of the most basic of these is the obligation of the parent to support the child until the law determines that he is able to care for himself ... the duty of parents to provide for the maintenance of their children is a principle of natural law; an obligation ... laid on them not only by nature herself, but by their own proper act, in bringing them into the world ...

The U.S. Supreme Court has recognized the obligation of parents to support their children. In *Dunbar v. Dunbar*, 190 U.S. 340, 351, 23 S.Ct. 757, 761, 47 L.Ed. 1084, 1092 (1903), the Court stated, "At common law, a father is bound to support his legitimate children and the obligation continues during their minority ..." See also *Wetmore v. Markoe*, 196 U.S. 68, 76, 25 S.Ct. 172, 175, 49 L.Ed. 390, 393 (1904); *Audabon v. Shufeldt*, 181 U.S. 575, 21 S.Ct. 735, 45 L.Ed. 1009 (1901).

The legislature of Maryland has made it a crime for parents to fail to support their minor children. Md.Code Ann., Fam. Law § 10–203 (1991).

As the Court of Appeals recently said in *Middleton v. Middleton, supra*, this obligation to provide support is not perfunctory, to be performed only at the voluntary pleasure or whimsical desire of the parent. Citing *Palmer v. State*, 223 Md. 341, 351, 164 A.2d 467, 473 (1960).

In view of the above authorities, there can be no question that appellant has a legal obligation to financially support his children until they reach the age of legal majority. The more difficult question is how to calculate the proper amount of that support. Fortunately, that question has been answered by

the Legislature of Maryland. Md.Code Ann., Fam.Law § 12–202(a)(1) (1991) states, "[I]n any proceeding to establish or modify child support, whether pendente lite or permanent, the court shall use the child support guidelines set forth in this subtitle." In order to use the guidelines as required by § 12–202(a)(1), it is necessary to calculate the income of the parents. "Income" is defined in § 12–201(b) of the Family Law Article as:

    (1) actual income of a parent, if the parent is employed to full capacity; or

    (2) potential income of a parent, if the parent is voluntarily impoverished.

██ The legislature's purpose in including potential income was to implement state and federal policy of requiring adequate support by precluding parents from avoiding their obligation by deliberately not earning what they could earn. *John O. v. Jane O.*, 90 Md.App. 406, 420 n. 5, 601 A.2d 149, 156 n. 5 (1992).

While the Code does not define the term "voluntarily impoverished," in *John O. v. Jane O., supra*, we had occasion to address the meaning of that term. We noted that neither the Legislature nor the Courts in existing case law had defined what "voluntarily impoverished" meant. We noted that no clear definition was found in any Maryland resource materials. Accordingly, we looked to the dictionary definitions of the words "voluntarily" and "impoverished." We noted that "voluntarily" means "done by design or intention; proceeding from the free and unrestrained will of the person; produced in or by act of choice...." "Impoverished" means "to make poor, reduce to poverty or to deprive ... of resources, etc."

██ The Court of Appeals has often stated that when construing a statute, "the Court considers its language in its natural and ordinary signification." *Baltimore County v. White*, 235 Md. 212, 217, 201 A.2d 358, 360 (1963); citing *Height v. State*, 225 Md. 251, 170 A.2d 212 (1961). Also, when language is plain and unambiguous it should be given effect in accordance with the plain meaning of the words; there is no

need to look beyond the language of the statute. *Koyce v. State Central Collection Unit,* 289 Md. 134, 140, 422 A.2d 1017, 1020 (1980); *Lowenthal v. Rome,* 294 Md. 277, 282, 449 A.2d 411, 413 (1982).

It is clear that the plain meaning rule does not require the courts to read legislative enactments in rote fashion and in isolation. Further, in construing the meaning of a statute the courts must look to the legislative purpose in passing the enactment. Nevertheless, the Court of Appeals has stated in a leading case on statutory construction, *Kaczorowski v. City of Baltimore,* 309 Md. 505, 515, 525 A.2d 628, 633 (1987) that, "Sometimes the language in question will be so clearly consistent with the apparent purpose (and not productive of any absurd result) that further research will be unnecessary," citing *Taylor v. Dept. of Employment and Training,* 308 Md. 468, 472, 520 A.2d 379, 381 (1987).

The issue of voluntary impoverishment most often arises in the context of a parent who reduces his or her level of income to avoid paying support by quitting, retiring or changing jobs. The intent of the parent in those cases is often important in determining whether there has been voluntary impoverishment. Was the job changed for the purpose of avoiding the support obligation and, therefore, voluntary, or was it for reasons beyond the control of the parent, and thus involuntary?

In defining the term "voluntarily impoverished" in *John O. v. Jane O.,* 90 Md.App. 406, 421, 601 A.2d 149, 156 (1992), we never intended to limit the obligation of a spouse who is voluntarily impoverished for any reason, to pay child support. A parent who chooses a life of poverty before having children and makes a deliberate choice not to alter that status after having children is also "voluntarily impoverished." Whether the voluntary impoverishment is for the purpose of avoiding child support or because the parent simply has chosen a frugal lifestyle for another reason, doesn't affect that parent's obligation to the child. Although the parent can choose to live in poverty, that parent cannot obligate the child

to go without the necessities of life. A parent who brings a child into this world must support that child, if he has or reasonably could obtain, the means to do so. *Carroll County v. Edelmann*, 320 Md. 150, 577 A.2d 14 (1990). The law requires that parent to alter his or her previously chosen lifestyle if necessary to enable the parent to meet his or her support obligation.

Accordingly, we now hold that, for purposes of the child support guidelines, a parent shall be considered "voluntarily impoverished" whenever the parent has made the free and conscious choice, not compelled by factors beyond his or her control, to render himself or herself without adequate resources. To determine whether a parent has freely been made poor or deprived of resources the trial court should look to the factors enunciated in *John O. v. Jane O.*, 90 Md.App. 406, at 422, 601 A.2d 149:

1. his or her current physical condition;
2. his or her respective level of education;
3. the timing of any change in employment or financial circumstances relative to the divorce proceedings;
4. the relationship of the parties prior to the divorce proceedings;
5. his or her efforts to find and retain employment;
6. his or her efforts to secure retraining if that is needed;
7. whether he or she has ever withheld support;
8. his or her past work history;
9. the area in which the parties live and the status of the job market there; and
10. any other considerations presented by either party.

Based on a review of the evidence before the circuit court, there was no error in finding that appellant was "voluntarily impoverished."

Once a court determines that a parent is voluntarily impoverished, the court must then determine the amount of potential income to attribute to that parent in order to calculate the support dictated by the guidelines. Some of the

factors the court should consider in determining the amount of potential income include:

1. age
2. mental and physical condition
3. assets
4. educational background, special training or skills
5. prior earnings
6. efforts to find and retain employment
7. the status of the job market in the area where the parent lives
8. actual income from any source
9. any other factor bearing on the parent's ability to obtain funds for child support.

After the court determines the amount of potential income to attribute to the parent, the court should calculate the amount of support by using the standardized worksheet authorized in Family Law § 12–203(a) and the schedule listed in Family Law § 12–204(e). Once the guideline support figure is determined, the court must then determine whether the presumptive correctness of the guideline support figure has been overcome by evidence that application of the guidelines would be unjust or inappropriate. Md.Code Ann., Fam.Law § 12–202(a)(2) (1991).

Unfortunately, the court below erred in determining that appellant's potential income was $60,000 per year, based solely on the his ability to raise funds to support and carry on this litigation. Although the court may consider the ability of appellant to persuade others to provide him with funds to pay child support in the future, the court cannot assume this will occur merely because appellant has been able to convince others to support this litigation up until now. The court needs to hear testimony and make findings regarding the factors relating to potential income previously enunciated. No such findings were made in this case. After calculating the guidelines using appellant's realistic potential income, the court must decide whether the presumptive correctness of the

guidelines has been overcome. Accordingly, this matter must be remanded to the trial court for such determinations.

In conclusion, we leave undisturbed the trial court's decision granting the parties a divorce, awarding custody of their six children to the appellee, and establishing conditions for visitation. We vacate the court's child support order and remand the matter to the trial court to recalculate the appellant's child support obligation in light of this opinion.

JUDGMENT AFFIRMED IN PART AND VACATED IN PART. CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. APPELLANT TO PAY THE COSTS.