667 A.2d 331

Natasha WILLS

v.

Randy W. JONES.

No. 23, Sept. Term, 1995.

Court of Appeals of Maryland.

Nov. 15, 1995.

Angela M. Eaves, Assistant Attorney General, (J. Joseph Curran, Jr., Attorney General; C.J. Messerschmidt, Assistant Attorney General, all on brief) Baltimore, for petitioner.

Hillary Galloway Davis (J. Edward Davis, both on brief) Towson, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

MURPHY, Chief Judge.

This case requires us to determine whether penal incarceration constitutes a material change of circumstance sufficient to justify the modification of a child support award under Maryland Code (1984, 1991 Repl.Vol., 1994 Supp.) § 12–104 of the Family Law Article, and whether an incarcerated parent should be considered voluntarily impoverished under § 12–204(b) of that Article. We hold that a prisoner's incarceration may constitute a material change of circumstance if the effect on the prisoner's ability to pay child support is sufficiently reduced due to incarceration. Moreover, we conclude that a prisoner is not "voluntarily impoverished" unless he or she committed a crime with the intent of going to prison or otherwise becoming impoverished.

I

A

As this Court has repeatedly recognized, one of the most fundamental duties of parenthood "is the obligation of the parent to support the child until the law determines that he is able to care for himself." *Carroll County v. Edelmann,* 320 Md. 150, 170, 577 A.2d 14 (1990); *see Middleton v. Middleton,* 329 Md. 627, 631, 620 A.2d 1363 (1993) (citing numerous decisions from this Court). In accordance with this obligation, § 5–203(b)(1) of the Family Law Article provides that parents "are jointly and severally responsible for the child's support, care, nurture, welfare, and education...." Title 12 of that Article gives Maryland courts the authority to award child support to a custodial parent or child support agency. *See* § 12–101(a). In limited circumstances, the courts also have authority to modify an existing child support award. § 12–104.

The child support guidelines codified at §§ 12–201 to 12–204 of the Family Law Article provide the method of analysis used to determine the amount of child support awarded in each case. Section 12–202(a)(2) makes the use of these guidelines mandatory unless the result would "be unjust or inappropriate in a particular case." When a court departs from the child support guidelines, it must make a written finding stating the amount of support that would have been ordered under the guidelines, how the court's order varies from the guidelines, and how this variance serves the best interests of the child. *Id.*

In general, the child support guidelines "establish[ ] child support obligations based on estimates of the percentage of income that parents in an intact household typically spend on their children." *Voishan v. Palma,* 327 Md. 318, 322–23, 609 A.2d 319 (1992). In *Voishan,* we discussed in detail the process of using the guidelines to fix a parent's support obligation. *See id.* at 323–24, 609 A.2d 319. For the present case, we reiterate that the obligation is calculated by determining each parent's monthly income, using the table at § 12–

204(e) to determine the parents' combined monthly support obligation, and dividing this obligation between the two parents in proportion to their relative incomes. *Id.*

Because the parents' income levels determine the amount of support that a child receives, it is imperative to accurately assess the parents' respective incomes. It is equally imperative that parents be prevented from avoiding their support obligations by purposefully reducing their income. Thus, § 12–201(b)(2) provides that a parent's "potential income" may be used to calculate the amount of the support obligation if the parent is "voluntarily impoverished." A parent's potential income is defined as "income attributed to a parent determined by the parent's employment potential and probable earnings level based on, but not limited to, recent work history, occupational qualifications, prevailing job opportunities, and earnings levels in the community." § 12–201(f).

## B

Randy Jones (Jones) and Natasha Wills (Wills) are the parents of Rhondell Durell Jones (Rhondell), born on October 5, 1982. Jones was incarcerated on September 23, 1992, when he began serving a mandatory ten-year sentence. The nature of the crime for which Jones was incarcerated is not disclosed in the record and is not relevant to our decision. At the time of his incarceration, Jones was obligated to pay Wills $50 per week in child support. Following his incarceration, Jones's cash income dropped to twenty dollars per month. Jones appears to have no assets. If Jones's support obligation remains at $50 per week throughout his incarceration, he will be approximately $26,000 in arrears by the time of his release.

On May 20, 1993, Jones filed in the Circuit Court for Anne Arundel County a motion to "Stay Enforcement of Child Support Obligation." Wills filed an answer opposing Jones's motion, and a hearing was held before a master on September 14, 1993. The master recommended that Jones's motion be denied, finding that his incarceration was "self-induced and voluntary" and therefore did not justify modifying Jones's

support obligation. The circuit court (Cawood, J.) disagreed and granted Jones's motion. The court found that Jones had not voluntarily impoverished himself through commission of a crime and his subsequent incarceration.

The Court of Special Appeals affirmed the circuit court's judgement. *Wills v. Jones,* 102 Md.App. 539, 650 A.2d 736 (1994). In her petition for writ of certiorari, which we granted, Wills argues that Jones's support obligation should not be modified because an incarcerated parent should be considered "voluntarily impoverished" within the meaning of § 12–204 of the Family Law Article.

## II

It is unclear from the record precisely what relief the circuit court granted by its order "staying enforcement" of Jones's child support obligation. Wills contends that the circuit court terminated Jones's obligation to support his child, while Jones contends that the circuit court merely suspended his support obligation under its authority to modify child support awards during the time he was in prison.

The confusion arises, at least in part, from the label under which Jones originally filed his petition. By its terms, Jones's original motion asked the circuit court to stay *enforcement* of the obligation during his stay in prison, and made no request to modify the *amount* of that obligation. Because Jones originally filed his petition *pro se,* however, the lower courts did not strictly hold him to the language of his original petition. As the Court of Special Appeals noted, "[a]lthough [Jones's] motion was for a stay of enforcement of his child support obligation, it is clear from the record that what he really sought (and what [Wills] and the trial judge understood he was requesting) was a cessation or suspension of the support obligation itself while he was incarcerated." *Wills, supra,* 102 Md.App. at 552, 650 A.2d 736.

If, as Wills contends, the circuit court's order was intended to terminate Jones's obligation to pay child support, its authority to do so cannot arise from § 12–104(a). Although

it is conceivable that a child support award could be modified to $0 per month if a parent's income were low enough or equitable considerations demanded it, the *obligation* to pay child support would remain. Because the obligation remains, a child support award of $0 can be increased when future circumstances may justify an increase or automatically increased when Jones is released on work release or released from prison. Section 12–104(a), however, contains no provision allowing a court to entirely terminate a parent's obligation.

For the purposes of this case, we will assume that the intermediate appellate court was correct in characterizing the circuit court's order as a modification of child support under § 12–104(a). Because we decline to create a *per se* rule freeing incarcerated parents with no assets from their child support obligations, we will remand the matter to the circuit court to determine whether Jones is entitled to a modification of child support under § 12–104(a). If so, the circuit court must determine the level of Jones's child support obligation by applying the child support guidelines, or provide an explanation for departing from those guidelines as required by § 12–202(a)(2)(iv).

### III

#### A

While we agree with the Court of Special Appeals that incarceration alone does not constitute "voluntary impoverishment," we undertake to clarify the role of voluntary impoverishment in the context of a motion to modify a child support award under § 12–104(a) of the Family Law Article. That section provides that "[t]he court may modify a child support award subsequent to the filing of a motion for modification and upon a showing of a material change of circumstance." Applying this section, the Court of Special Appeals determined that "[w]ith regard to petitions for child support modification, 'voluntary impoverishment' does not constitute a material change of circumstances." *Wills v. Jones, supra,* 102 Md.App.

at 548, 650 A.2d 736.  In our view, however, the question of
whether a material change of circumstance has occurred is
distinct from the issue of whether a parent is voluntarily
impoverished.

Before a court can consider the level of support to which a
child is entitled under the guidelines, it must determine that it
has authority to grant the requested motion.  Section 12–104
provides the Maryland courts with authority to modify a child
support award only when (1) there has been a change of
circumstance and (2) the change is material.  *See* § 12–104(a).
These limitations upon the courts' authority to modify child
support awards tend to inhibit the filing of a deluge of motions
seeking modification of child support orders.

▬▬  The "material change of circumstance" requirement
limits the circumstances under which a court may modify a
child support award in two ways.  First, the "change of
circumstance" must be relevant to the level of support a child
is actually receiving or entitled to receive.[1]  Second, the

---

1.  There are two changes in circumstance which are obviously "rele-
vant" to modification of a child support award.  First, a relevant
change in circumstances may occur upon the passage of some event
causing the level of support a child actually receives to diminish or
increase.  For example, in *Walsh v. Walsh*, 333 Md. 492, 635 A.2d 1340
(1994), a divorce decree required the husband to pay one-half of the
mortgage on the home in which his children were residing.  When the
husband agreed to sell his interest in the home to his ex-wife, so that his
mortgage obligation would cease, we noted that the question of whether
the cessation of the husband's obligation to pay one-half of the mort-
gage was a material change in circumstances depended upon "whether
the [obligation] ... was in some manner a form of child support."  *Id.*
at 503, 635 A.2d 1340.  If so, the cessation of the obligation altered the
amount of support the children would receive, and would be a material
change if the mortgage payments were sufficiently large.  *Id.*  Con-
versely, if no part of the husband's mortgage payment were child
support, the level of support received by the children would not dimin-
ish, and thus the cessation of the payment by itself would not have met
the "relevancy" requirement.

The second circumstance is that before us here, where a change has
occurred that affects the income pool used to calculate the support
obligations upon which a child support award was based.  An example
of such a change in circumstance would be where one parent loses his
or her employment.  In this case, Jones's incarceration currently makes

requirement that the change be "material" limits a court's authority to situations where a change is of sufficient magnitude to justify judicial modification of the support order. *See Walsh v. Walsh,* 333 Md. 492, 503, 635 A.2d 1340 (1994). In making this threshold determination that a material change of circumstance has occurred, therefore, a court must specifically focus on the alleged changes in income or support that have occurred since the previous child support award. *Cf. id.* at 501, 635 A.2d 1340 ("In determining if there is a material change of circumstances, a court must first look to the circumstances at the time of the original support order."). It should generally be unnecessary to inquire into a parent's motivations, intentions, or income-earning capacity, because the court can focus on the specific alleged changes to the income sustained by each parent.[2]

To determine whether a parent is voluntarily impoverished, on the other hand, a court must inquire as to the parent's motivations and intentions. *See, e.g., Goldberger v. Goldberger,* 96 Md.App. 313, 327, 624 A.2d 1328 (1993) (noting that "a parent shall be considered 'voluntarily impoverished' whenever the parent has made the free and conscious choice, not compelled by factors beyond his or her control, to render himself or herself without adequate resources," and listing a ten-part test for making this determination), *cited in Petrini v. Petrini,* 336 Md. 453, 465–66, 648 A.2d 1016 (1994). In

---

it impossible for him to maintain employment, and clearly meets the "relevance" inquiry.

We enumerate these two categories of "relevant" circumstances merely as an illustration. We do not intend to preclude lower courts from finding other kinds of changes in circumstance to be relevant to modification of a child support award.

2. In *Walsh,* we found that the court should inquire into the purposes served by the mortgage payment in determining whether it should be characterized as child support. *Walsh, supra,* 333 Md. at 503, 635 A.2d 1340. To some degree, this does require an inquiry into the parents' intentions. This inquiry was limited to the intention behind a single provision in a divorce agreement, however, and will be much more limited than the broad-ranging inquiry required to determine if a parent is voluntarily impoverished.

addition, once a parent is found to be voluntarily impover-
ished, the court must assess the parent's income-earning
potential. *See* §§ 12–201(b)(2) & 12–201(f) of the Family Law
Article (requiring assessment of potential income and enumer-
ating factors to be considered in determining potential in-
come). Both of these inquiries go beyond what is necessary to
determine whether a material change of circumstance has
occurred.

If we were to adopt the rule that " 'voluntary impoverish-
ment' does not constitute a material change of circumstances,"
*Wills, supra,* 102 Md.App. at 548, 650 A.2d 736, the result
would be to leave the voluntarily impoverished parent's child
support obligation at a level determined by the salary from his
or her last employment. Section 12–201(f) of the Family Law
Article, however, defines potential income as "income attrib-
uted to a parent determined by the parent's employment
potential and probable earnings level *based on, but not limited
to,* recent work history, occupational qualifications, prevailing
job opportunities, and earnings levels in the community."
(emphasis added). By its language, although a court may
consider additional factors, § 12–201(f) *requires* a court at
least to consider all of the enumerated factors in determining
a parent's potential income. If "voluntary impoverishment"
always precludes a finding that a material change of circum-
stance has occurred, a parent's recent work history alone will
determine the level of income attributed to the voluntarily
impoverished parent. For this reason, the question of a
parent's "voluntary impoverishment" must be separated from
the determination that a material change of circumstance has
occurred.

■ Because "voluntary impoverishment" should not be
addressed until after the court determines that a material
change in circumstance has occurred, the issue of voluntary
impoverishment need never be reached in cases where a
parent's underemployment does not significantly alter the
parent's ability to meet the child support obligation. In this
case, it appears that Jones has no assets and he currently

earns only $20 per month. His incarceration is a temporary material change of circumstance.

## B

Once a court finds that a material change in circumstance has occurred, it must apply the guidelines in §§ 12–202 to 12–204 of the Family Law Article to determine the level of support to which the child is currently entitled. § 12–202(a). While a parent's support obligation is usually determined by the parent's adjusted actual income, § 12–204(a), "if a parent is voluntarily impoverished, child support may be calculated on a determination of potential income." § 12–204(b). Wills argues that Jones should be considered voluntarily impoverished, and that as a result his support award should remain at its current level. In this regard, Wills contends that Jones is voluntarily impoverished because he "made the free and conscious choice, not compelled by factors beyond his control, to commit a crime punishable by a period of incarceration." According to Wills, so long as Jones's criminal behavior was within his control, his incarceration was a foreseeable consequence of that behavior, and therefore his incarceration was "voluntary" regardless of whether he actually sought to be incarcerated. Wills maintains that to find Jones's incarceration "involuntary" would be to "shift the blame for the individual's situation to the state, rather than recognizing the state's duty to its citizens to enforce its criminal laws." Incarcerated parents, Wills argues, should not be rewarded for their criminal acts by having their child support obligations reduced or terminated.[3]

---

3. Because of the confusion over whether the circuit court's award suspends Jones's obligation or terminates it, it is unclear whether Wills asserts these arguments only against a complete *termination* of Jones's support duties, or whether she asserts the same arguments against modifying Jones's support payments. As her primary argument is that Jones should be considered voluntarily impoverished and his level of support should not be changed as a result of his voluntary impoverishment, we assume that Wills also opposes *reducing* Jones's support payments as a result of his reduced present income.

Jones, on the other hand, proposes that we adopt the reasoning in *Goldberger v. Goldberger, supra.* He says that our inquiry must focus on whether he made a free and conscious choice to render himself without adequate resources. He argues that he did not seek incarceration, made no conscious choice to render himself without resources, and therefore should not be considered voluntarily impoverished.

█ Although Wills and Jones raise many arguments based upon underlying policy considerations, the question before us is primarily one of statutory construction. In this inquiry, "the beginning point of statutory construction is the language of the statute itself." *Morris v. Prince George's County,* 319 Md. 597, 603, 573 A.2d 1346 (1990). The term "voluntary impoverishment" is not defined in the statute, although two separate sections of the guidelines use the term. In § 12–201(b)(2), "income" is defined as the "potential income of a parent, if the parent is voluntarily impoverished." The term "voluntarily impoverished" is also used in § 12–204(b)(1), which provides that "if a parent is voluntarily impoverished, child support may be calculated based on a determination of potential income."

█ To ascertain the meaning ascribed to "voluntarily impoverished" by the legislature, we "are free to look at the context within which statutory language appears." *Morris, supra,* 319 Md. at 604, 573 A.2d 1346. The child support guidelines were introduced into the Maryland Legislature in 1989 as Senate Bill 49 and became ch. 2 of the Acts of 1989. As originally proposed, § 12–201 defined "income" as "potential income ... if the parent is *unemployed or underemployed.*" (emphasis added). The change from "unemployed or underemployed" to "voluntarily impoverished" in § 12–201(b)(2) was originally proposed by the House Judiciary Committee following its consideration of the Senate bill, and was incorporated into the Senate's version of the enacted bill. *See* 1 Journal of Proceedings of the House of Delegates of Maryland 587–88 (1989); 1 Journal of Proceedings of the Senate of Maryland 703–04 (1989).

As originally proposed, § 12–204(b)(1) provided that "if a parent is voluntarily unemployed or underemployed, child support shall be calculated based on a determination of potential income." The House Judiciary committee proposed replacing "voluntarily unemployed or underemployed" with "voluntarily impoverished," and this change was accepted into the version of the bill originally passed by the House of Delegates. *See* 1 Journal of Proceedings of the House of Delegates of Maryland 590 (1989). Although the Senate originally rejected this change, *see* 1 Journal of Proceedings of the Senate of Maryland 705–06, the replacement was adopted by the conference committee when the two versions of the bill were reconciled. *See* 2 Journal of Proceedings of the Senate of Maryland 757 (1989). In addition, the final bill replaced the original requirement that an involuntarily impoverished parent's obligation "shall" be calculated using his or her potential income with an option that the parent's obligation "may" be calculated based on the parents' potential income. *See id.*

The meaning of "voluntary impoverishment" as used in the child support guidelines has not been previously addressed by this Court. The Court of Special Appeals has sought to define the term on several occasions. In *John O. v. Jane O.,* 90 Md.App. 406, 601 A.2d 149 (1992), it interpreted the legislative history of § 12–201(b)(2) as an indication that the Legislature intended "that the courts be able to consider whether a person had purposely taken a reduction in salary to avoid his or her support obligation." *Id.* at 420 n. 5, 601 A.2d 149. As a result, it defined "voluntary impoverishment" to require that the voluntarily impoverished parent purposefully intend to avoid his or her child support obligation. *Id.* at 421, 601 A.2d 149 ("[I]n the context of a divorce proceeding, the term 'voluntarily impoverished' means: freely or by an act of choice, to reduce oneself to poverty or deprive oneself of resources with the intention of avoiding child support or spousal obligations.").

In *Goldberger, supra,* 96 Md.App. at 326–27, 624 A.2d 1328, the Court of Special Appeals expanded its definition of "voluntary impoverishment" to include those who were purposefully

impoverished but not purposefully seeking to avoid paying child support. The court found that "[a] parent who chooses a life of poverty before having children and makes a deliberate choice not to alter that status after having children is also 'voluntarily impoverished.'" *Id.* at 326, 624 A.2d 1328. The court concluded that "a parent shall be considered 'voluntarily impoverished' whenever the parent has made the free and conscious choice, not compelled by factors beyond his or her control, to render himself or herself without adequate resources." *Id.* at 327, 624 A.2d 1328.

Our review of the language and legislative history of the child support guidelines leads us to conclude that the legislature intended that a parent's support obligation can only be based on potential income when the parent's impoverishment is intentional. In addition to replacing the phrase "unemployed or underemployed" with the word "impoverished," the final version of the guidelines specifically added the word "voluntary" to both instances where a parent's potential income can be calculated based upon the parent's impoverishment. *See* §§ 12–201((b)(2), 12–204(b)(1). As the Court of Special Appeals reasoned in *John O., supra,* 90 Md.App. at 421, 601 A.2d 149, the addition of the word "voluntarily" adds an element of intent.

The inquiry into the parent's intent adopted in *John O.,* however, is too narrow. In determining whether a parent is voluntarily impoverished, the question is whether a parent's *impoverishment* is voluntary, not whether the parent has voluntarily avoided paying child support. The parent's intention regarding support payments, therefore, is irrelevant. It is true that parents who impoverish themselves "with the intention of avoiding child support ... obligations" are voluntarily impoverished. *John O., supra,* 90 Md.App. at 421, 601 A.2d 149. But, as the court recognized in *Goldberger, supra,* 96 Md.App. at 326–27, 624 A.2d 1328, a parent who has become impoverished by choice is "voluntarily impoverished" regardless of the parent's intent regarding his or her child support obligations.

The "voluntariness" of an action and the meaning of "voluntary" in a statute have previously been addressed by this Court in several contexts. For an action to be "voluntary," we have consistently required that the action be both an exercise of unconstrained free will and that the act be intentional. *See, e.g., Lowenthal v. Rome,* 294 Md. 277, 282–83, 449 A.2d 411 (1982), *cert. denied,* 460 U.S. 1012, 103 S.Ct. 1253, 75 L.Ed.2d 481 (1983) (quoting dictionary definitions of "voluntary" that combine the characteristics of free will and intent, and applying these definitions to determine whether an appearance in a foreign court was voluntary); *Nichols v. Nichols,* 181 Md. 392, 394, 30 A.2d 446 (1943) (noting, in determining whether a separation prior to divorce was voluntary, that "[t]he word 'voluntary' signifies willingness. When used in reference to an act of an individual, it means that he acted of his own free will") (quotations omitted); *cf.* Black's Law Dictionary 1413 (6th ed. 1990) (defining "voluntary" as "[d]one by design or intention," "[p]roceeding from the free and unrestrained will of the person," or "[p]roduced in or by an act of choice").

We have addressed the question of "voluntariness" at length in the context of whether an employee left her past employment voluntarily, and therefore should be barred from collecting unemployment benefits. *Allen v. Core Target City Y. Prog.,* 275 Md. 69, 338 A.2d 237 (1975). There, as here, the term "voluntarily" was not defined by the statute. *Id.* at 77, 338 A.2d 237. After reviewing the common usage of "voluntary" as defined in a dictionary, we found that

> the phrase "due to leaving work voluntarily" has a plain, definite and sensible meaning, free of ambiguity; it expresses a clear legislative intent that to disqualify a claimant from benefits the evidence must establish that the claimant, by his or her own choice, intentionally, of his or her own free will, terminated the employment.

*Id.* at 79, 338 A.2d 237. Following this definition, we found that an employee who had been discharged from her job because she was unable or unwilling to perform it properly could not be said to have left "voluntarily." *Id.* at 80, 338 A.2d 237; *see also Sinai Hospital of Baltimore, Inc. v. Department*

*of Employment & Training,* 309 Md. 28, 34–35, 522 A.2d 382 (1987) (quoting *Allen*'s definition of "voluntary" in a similar context).

Our inquiry here is similar to that made in the unemployment context. In *Allen,* we noted that "[i]f an employee is discharged for any reason, other than perhaps for the commission of an act which the employee *knowingly intended* to result in his discharge, it cannot be said that his or her unemployment was due to 'leaving work voluntarily.' " *Allen, supra,* 275 Md. at 79, 338 A.2d 237 (emphasis added). Thus, misconduct on the part of an employee is not sufficient to deem a subsequent termination of employment "voluntary" even if the employee's termination was a foreseeable result of the misconduct. *See id.* at 80, 338 A.2d 237. To determine whether Jones's impoverishment is "voluntary," a court must similarly ask whether his current impoverishment is "by his . . . own choice, intentionally, of his . . . own free will." *Allen, supra,* 275 Md. at 79, 338 A.2d 237. The contention that Jones's incarceration and subsequent impoverishment should be considered "voluntary" because he made the free and conscious choice to commit a crime stretches the meaning of the word beyond its acceptable boundaries. Jones's incarceration can only be said to be "voluntary" if it was an intended result.

The contentions raised by Wills, therefore, are without merit. Our prior decisions rest upon an implicit belief that the foreseeability of an action's possible consequences is not sufficient to conclude that the actor brought those consequences about "voluntarily."[4] A finding that Jones is not voluntarily impoverished in no way "blames" the state for Jones's incarceration. The child support guidelines do not assign "blame," they assign child support obligations based upon a parent's income. Similarly, our decision gives Jones no "reward" for his criminal action. Even putting aside the loss

---

4. We note, however, that a court may consider the likelihood of a prisoner's arrest and conviction following the commission of his or her particular crime as evidence regarding the prisoner's intentions.

of liberty and other negative aspects of incarceration, a prisoner's child support obligation should be reduced only in proportion to the prisoner's reduced ability to pay. The prisoner's loss of income and subsequent reduced child support obligation cannot make the prisoner richer than before the commission of the crime. For these reasons, we hold that a prisoner is only "voluntarily impoverished" as a result of incarceration if the crime leading to incarceration was committed with the intention of becoming incarcerated or otherwise impoverished.

## C

■ The circuit court's holding rests upon an implicit determination that Jones did not commit the crime leading to his incarceration with the intention of avoiding his child support obligation. Consistent with this position, the circuit court on remand must calculate Jones's current support obligation based upon his current actual income. § 12–204(a). The circuit court's only explicit finding as to Jones's actual income was to note that "[h]e has no assets and no ability to pay anything." This seems to ignore the $20 per month income with no offsetting expenses. Whether any part of that $20 should go toward child support does not seem to be addressed.

The determination of the actual income received by a parent is ultimately a factual question within the province of the circuit court. Md.Rule 8–131(c). At the same time, however, the circuit court is required to make this determination in accordance with § 12–201(c)(1) of the Family Law Article, which defines "actual income" as "income from any source." Section 12–201(c)(3) lists fifteen items that must be included in a parent's actual income, including salaries and wages, interest, dividend, and pension income, expense reimbursements or in-kind payments, and various government benefits. In addition, § 12–201(c)(4) provides an additional list of items that may be considered actual income "[b]ased on the circumstances of the case," including gifts. If the circuit court, when calculating Jones's actual income, finds the resulting support

obligation unjust or inappropriate, it may order support of $0 during Jones's incarceration.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REMAND THE CASE TO THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO BE EQUALLY DIVIDED BETWEEN THE PARTIES.*