766 A.2d 1049

**Wilson A. RIVERA**

**v.**

**Victoria Ann ZYSK.**

**No. 2682, Sept.Term, 1999.**

Court of Special Appeals of Maryland.

Feb. 8, 2001.

608

Gregory L. Stephenson, Glen Burnie, for appellant.

Stacy LeBow Siegel (Rachel E. Murray and Stacy LeBow Siegel, L.L.C., on the brief), Towson, for appellee.

Argued before THIEME,\* KENNEY, and JAMES S. GETTY, (Retired, specially assigned), JJ.

JAMES S. GETTY, Judge (Retired, Specially Assigned).

Wilson A. Rivera, hereinafter referred to as appellant, filed a timely appeal from several orders entered by the chancellor in the Circuit Court for Baltimore County involving petitions for constructive contempt and modification of prior orders for alimony and child support.

Appellant was divorced from his wife, Victoria A. Zysk,[1] the appellee herein, by judgment of the circuit court dated October 22, 1998. The divorce judgment incorporated an agreed "Stipulated Property Distribution," and required that appellant pay child support of $580 per month for support of his son Michael, age fourteen, whose primary physical custody was granted to his mother. Appellant also agreed to pay alimony of $1,800 per month indefinitely.

By letter dated July 30, 1999, which was nine months after the divorce was granted, appellant was notified by his employer, Dynatech Integrated Systems, that his employment was being terminated, effective August 31, 1999, "due to the lack of viable work matching skills." Appellant had been employed by Dynatech as a project manager earning $87,900 annually. Appellee was employed as a teacher in a private school earning approximately $23,000 per year.

In October 1999, appellant began paying child support based upon his recalculation of the child support guidelines. He utilized as his income $840 per month in unemployment benefits and $275 per month rental income from a part-time tenant in his home. For the months of October, November, and December 1999, he paid a total of $422 in child support and no alimony.

---

\* Thieme, J., participated in the hearing and conference of this case while an active member of this Court; he participated in the adoption of this opinion as a retired, specially assigned member of this Court.

1. Appellee was granted the right to resume the use of her maiden name.

On or about September 13, 1999, appellant filed a petition for modification of child support and alimony. On November 18, 1999, appellee filed a petition for contempt, alleging that appellant owed $4,472 for child support and alimony for October and November 1999.

A hearing on appellee's petition for contempt and appellant's petition for modification was held on December 14, 1999. On January 24, 2000, the court held appellant in contempt for failure to pay alimony and child support in accordance with the divorce decree and set a purge provision of $6,718 ($2,380 per month X 3, for 4th quarter, less $422 paid), which was reduced to judgment. On appellant's petition for modification, the court modified appellant's support obligation for the first three months of the year 2000 by abating the alimony for that period and reducing the child support to $334 per month for those three months.

In this appeal, appellant questions whether

1. The court erred in failing to modify his support obligations for October, November, and December during which time he was involuntarily unemployed.
2. The court erred in finding appellant in contempt and in entering judgment for $6,718 arrearage.
3. The court erred in deciding an issue of a QDRO without holding a hearing requested by appellant.
4. The court erred in awarding appellee $1,000 toward counsel fees.

### Burden of Proof

In a case of civil contempt, the intended purpose of the proceeding is remedial, intending to benefit the recipient of the funds by compelling the payor to comply with the existing court order. The petitioner's burden of proof, therefore, is to prove by clear and convincing evidence that the alleged contemnor has not paid the amount owed, accounting from the effective date of the support order through the date of the contempt hearing. Conversely, the burden of proof on the alleged contemnor is to prove by a fair preponderance of

the evidence that, from the date of the support order through the date of the contempt hearing, the alleged contemnor (i) never had the ability to pay more than the amount actually paid and (ii) made reasonable efforts to become or remain employed or otherwise lawfully to obtain the funds necessary to make payment. *See* Md. Rule 15–207(e)(2)(3).

The chancellor informed counsel that he was going to proceed with "whatever [petition] was first, that's what I'm going to start with ." Appellee's counsel stated that the first pleading was appellee's petition for contempt relating to appellant's refusal to execute a Qualified Domestic Relations Order (QDRO), the second petition for contempt was for non-payment of support, and "then there is Mr. Rivera's petition for a decrease of child support and alimony." Counsel's response was partially correct. The petition relating to the QDRO was filed on August 23, 1999, and was the first petition filed. Appellant's petition for modification, however, preceded appellee's non-support petition by two months. The chancellor disposed of the QDRO issue [2] and then proceeded with the appellee's non-support citation. As a result, appellant's petition for modification followed the contempt proceeding.

We mention the chronology because of the questions that arose when the chancellor considered appellant's motion for modification. He said:

> Now we go to his petition to reduce. Now he's not—he doesn't have clean hands. So whatever I do, I'm not going to go back into the past because, you know, because I found him in contempt, how can I give him credit. I'm not going to do that.[3]

The court then stated that the amount necessary to purge the contempt was $6,718, which was reduced to judgment.

---

2. We will discuss the QDRO issue later as question number three.

3. Had the court proceeded with the petition for modification prior to considering the non-support, the problem cited by the court may not have occurred.

After concluding that appellant was not entitled to modification for October, November, and December 1999, due to the finding of contempt, the court refigured the child support, prospectively imputing $29,000 income to appellant and $23,000 to appellee, which resulted in a monthly child support contribution of $333 charged to appellant. The alimony was abated for the three-month duration of the modification. The court indicated that the money attributed to appellant beginning in April 2000 would increase to $50,000.[4]

### *Discussion*

We shall address first appellant's second issue, the finding of contempt. Initially, we recognize that a parent is obligated to support his or her children, and a parent, therefore, cannot use unemployment as an excuse to avoid a child support obligation. *Goldberger v. Goldberger,* 96 Md.App. 313, 326–27, 624 A.2d 1328, *cert. denied,* 332 Md. 453, 632 A.2d 150 (1993).

There is absolutely no evidence in this case that appellant had a present ability to pay the purge amount of $6,718. He was unemployed through no fault of his own. Appellant testified that he had $35 in cash; that his income was $840 a month unemployment insurance and $275 per month rental income. He had approximately $5,000 remaining in an equity line of credit that initially had totaled to $26,000. Appellant's monthly expenses, including alimony and child support, were $5,590; his personal expenses were $2,656, which included a mortgage, equity loan, car payment, food, medical and dental insurance coverage (including $212 per month for the child), and other incidental expenses.

The chancellor based his finding of contempt on appellant's refusal to use his equity line of credit to pay his child support and alimony obligations. Although he stated that he was more concerned with the failure to pay child support, the

4. The modification did not occur. Appellant obtained other employment in January 2000 at the same figure he earned previously. He resumed paying $2,380 monthly.

chancellor included $5,400 unpaid alimony in the purge amount. The court's comments relating to the finding of contempt were as follows:

> I'm going to find him in contempt.... I find that the plaintiff has not paid the amount owed; and I find that the plaintiff has not proven to me by a preponderance of the evidence that he never had the ability to pay more than he actually paid and that he made reasonable efforts. Well, I don't have any problem with his effort but that otherwise he could have lawfully obtained the funds necessary to make the payments ... I think he could have.

The chancellor's questioning of appellant on the equity line of credit is relevant to the question of contempt. We repeat that discussion:

> THE COURT: You say you are buying a condo, or you are thinking about it?
>
> APPELLANT: I have a condo on contract for investment purposes, yes.
>
> THE COURT: Okay, so now you're thinking long term I gather ... I'm having trouble with this one. I mean, you owe child support and you take the money and you are going to think long term. I don't follow that one.
>
> APPELLANT: My wife and I invested in real estate.
>
> THE COURT: I understand that ... the point of my question has to do with timing. You ... are telling me that you are going to take five thousand dollars and rather than pay child support, you are going to buy a condominium.
>
> APPELLANT: I think I can turn that around and make profit and have more money available for paying the child support.[5]

---

**5.** In September 1999, appellant had made a $600 deposit on the purchase of a condominium that had been repossessed by HUD. The purchase price was $58,000. Appellant had advertised the condominium for resale before closing on the purchase. He had $5,000 remaining in his equity line of credit, which he intended to use as a down payment on the condominium if he was unable to sell it prior to his

Clearly, the chancellor's finding of contempt was based upon appellant's refusal to borrow $5,000 from a bank to pay his support obligations. We are aware of no decision of any court in this State requiring that, under the threat of contempt, an obligor under a support order incur a debt in satisfaction of that order. Neither do we believe the Legislature intended that an obligor may be held in contempt when he has no income sufficient to pay a support obligation but, conceivably, could borrow the amount due from a relative, a friend, by the use of a credit card, or any other source that creates a debt.

■ When a support order calls for the payment of money, the defendant is entitled to the opportunity to show that he or she had neither the estate nor the present ability to pay the obligation. *Lynch v. Lynch,* 342 Md. 509, 521, 677 A.2d 584 (1996), citing *Elzey v. Elzey,* 291 Md. 369, 374, 435 A.2d 445 (1981). We hold that appellant herein met that burden by a preponderance of the evidence for the following reasons.

Pellucidly, a defendant with monthly living expenses of approximately two thousand dollars and a monthly income of $1,115 cannot pay a purge of $6,718, even if he paid no bills, personal or otherwise. Neither can payment be coerced by reducing to judgment an amount found to be due, which may place other assets in jeopardy. We conclude that the chancellor erred by considering any or all of appellant's line of credit as income available to appellant for payment of child support.

Appellant used the line of credit to repay a $14,000 401k loan for a daughter's education, which would have been chargeable to him as income when he left Dynatech. He used an additional $5,400 to pay for a course upgrading his computer skills in his effort to be re-employed; and he used several thousand dollars to pay credit card debts.

No one disputes that the facts of this case establish a change in circumstances warranting a review of appellant's

---

closing set for December 31, 1999. Without the down payment, he would forfeit the $600 deposit. Appellant was seeking a sale price of approximately $79,000.

ability to pay support. As applied to this case, the changed circumstances require a determination, under sec. 12–204(a) of the Family Law Article, of the adjusted actual income of both parents.

Income is defined in sec. 12–201(b) as:

(1) actual income of a parent if the parent is employed to full capacity; or

(2) potential income of a parent if the parent is voluntarily impoverished.

. . .

(c) actual income means income from any source.

Section (c)(3) sets forth what is included as "actual income": salaries, wages, commissions, bonuses, dividends, pensions, interest, trust annuities, social security benefits, worker's compensation, unemployment benefits, disability insurance, alimony or maintenance, expense reimbursements, severance pay, capital gains, gifts or prizes. Although the list may not be exclusive, nowhere does a debt qualify as income.

When the chancellor moved from the contempt issue to appellant's petition for modification, moreover, the court agreed that appellant could not make the payment. We quote:

All right. Now let's talk in futuro. He doesn't have a job. He clearly can't afford to pay eighteen hundred dollars plus five eighty. I mean there's no question about that. I mean, even if he made yeoman efforts to make payments, he wouldn't be able to do that unless he liquidated pension plans and that sort of thing. I am not going to do that. I'm not going to make him do anything.

We agree, and strike the finding of contempt and the judgment entered thereon.

### *The Modification*

■ Based on the court's concession that appellant was entitled to a modification in child support and alimony, a revised payment schedule was ordered for the first three

months for the year 2000. As we noted earlier herein, child support was set at $333 per month and alimony was abated for the period. Although the modification was not implemented because appellant obtained other employment at the same figure he earned at Dynatech, which allowed him to resume his payments set in the decree of divorce, we do not agree with the court's method of computing child support.

In fairness to the chancellor, the error is not of his making and arises from an inadvertent statement in *Wills v. Jones,* 340 Md. 480, 667 A.2d 331 (1995), relating to potential income.[6] We explain.

In *Wills,* at 494, 667 A.2d 331, the Court stated:

Our review of the language and legislative history of the child support guidelines leads us to conclude that the legislature intended that a parent's support obligation can only be based on potential income when the parent's impoverishment is intentional. . . . [T]he final version of the guidelines specifically added the word "voluntary" to both instances where a parent's potential income can be calculated based upon the parent's impoverishment. *See* §§ 12–201(b)(2), 12–204(b)(1).

On page 493 in *Wills,* however, in discussing the final bill adopted by the legislature, the Court said:

In addition, the final bill replaced the original requirement that an *involuntarily* impoverished parent's obligation "shall" be calculated using his or her potential income with

---

6.  *Wills* dealt with voluntary and involuntary impoverishment in determining child support under the guidelines. Specifically, the issue in *Wills* was whether a defendant who had a child support obligation was "voluntarily impoverished" by committing a crime which resulted in his incarceration. The Court said not unless he committed the crime for the express purpose of avoiding the support obligation.

The Court made clear, however, that a parent who voluntarily quits a job or refuses to seek employment may have his or her support obligation computed by attributing potential income to the parent. Conversely, an involuntarily impoverished parent's obligation is determined from actual income.

an option that the parent's obligation "may" be calculated based on the [parent's] potential income.

Clearly, the operative words were changing "shall" to "may." The use of the word "involuntary" was inadvertent and went undetected. The 1989 statute dealt exclusively with voluntary impoverishment. It provides as follows:

> (B) EXCEPT AS PROVIDED IN PARAGRAPH (2) OF THIS SUBSECTION, IF A PARENT IS VOLUNTARILY ~~UNEMPLOYED OR UNDEREMPLOYED~~ *IMPOVERISHED,* CHILD SUPPORT ~~SHALL~~ *MAY* BE CALCULATED BASED ON A DETERMINATION OF POTENTIAL INCOME.

As it appears in *Wills,* the sentence on page 493 contradicts the legislative intent expressed on page 494. The intended word was "voluntarily" impoverished.

■ Unfortunately, the incorrect language has crept into later cases and is being cited as allowing judges to use potential income in establishing support attributable to involuntarily impoverished parents.[7] In this case, appellee cited *Wills* as follows:

> Finally, in those cases in which a parent is involuntarily impoverished, that parent's obligation *may* be calculated using that parent's potential income.

The chancellor herein, understandably, but erroneously, determined appellant's child support obligation by assigning potential income to him. Potential income may be considered only when the obligor is *voluntarily* impoverished.

The chancellor herein imputed to appellant income of $29,000 for the first three months of 2000 and indicated that in April the figure would rise to $50,000. The $333 child support was based on appellant's $29,000 income and appellee's $23,000 income as a teacher.

---

7. The incorrect statement in *Wills* was repeated in *Sczudlo v. Berry,* 129 Md.App. 529, 743 A.2d 268 (1999), but that case was decided on other grounds.

■  Section 12–104 of the Family Law Article permits a trial court to modify an amount of child support upon a showing of a material change in circumstances.  Once a material change in circumstances has occurred, the court must apply the guidelines in sec. 12–202 to 12–204 of the Family Law Article to determine the level of support to which the child is currently entitled.  *Wills, supra,* 340 Md. at 491, 667 A.2d 331.

■  Unquestionably, an *involuntary* loss of employment is a material change in circumstances.  We expressly recognized that situation in *Sczudlo, supra,* a case involving a petition for contempt and a petition for modification when appellant's $115,000 job was abolished.

In *Wills,* the Court interpreted the Family Law Article method of analysis used to determine child support.  In pertinent part, the Court stated:

> [T]he obligation is calculated by determining each parent's monthly income, using the table at § 12–204(e) to determine the parents' combined monthly support obligation, and dividing this obligation between the two parents in proportion to their relative incomes.
>
> . . .
>
> Thus, § 12–201(b)(2) provides that a parent's "potential income" may be used to calculate the amount of the support obligation if the parent is "voluntarily impoverished."  A parent's potential income is defined as "income attributed to a parent determined by the parent's employment potential and probable earnings level based on, but not limited to, recent work history, occupational qualifications, prevailing job opportunities, and earnings levels in the community." [8]

---

**8.**  Ordinarily, we would not address the reduction issue, since appellant was re-employed before the effective date of the reduction, making that issue moot in this case.  We opt to address it to remind trial judges to compute correctly child support obligations when the parent is involuntarily impoverished.

*QDRO*

█ We perceive no error in the chancellor's granting appellee the earnings experience generated by the Northrup Grumman 401k. The agreement signed by the parties gave appellee 50% of the account valued at $234,000. At the time of distribution, nearly one year later, the account had appreciated to approximately $300,000. Appellant argues that appellee was entitled to 50% of the value of the account as of the date of the agreement and all subsequent earnings remained with appellant. The chancellor concluded that the agreement was not ambiguous and awarded appellee 50% of the increased value. The decision was eminently fair.

Neither do we perceive any abuse of discretion in appellant being ordered to pay $1,000 toward appellee's counsel fees.

**JUDGMENT REVERSED AS TO THE FINDING OF CONTEMPT, AFFIRMED AS TO THE QDRO AND COUNSEL FEES.**

**COSTS TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.**