Stephen Sieglein v. Laura Schmidt, No. 76, Sept. Term, 2015 Opinion by Battaglia, J.

**MD. CODE ANN., EST. & TRUSTS § 1-206(b) – Artificial Insemination**
The term "artificial insemination," as used in Section 1-206(b) of the Estates and Trusts Article of the Maryland Code, includes reproductive techniques, including in vitro fertilization, in which donated sperm is utilized in the procedure.

**MD. CODE ANN., FAM. LAW § 12-204(b) – Voluntary Impoverishment**
The traditional notion of "voluntary impoverishment" involves attempts to avoid or reduce a child support obligation through the voluntary reduction of income. The trial court did not abuse its discretion in finding, based on an application of the appropriate factors to the evidence presented at trial, that the Petitioner voluntarily impoverished himself.

**MD. CODE ANN., FAM. LAW § 1-203(a) – Injunction**
Section 1-203(a) of the Family Law Article authorizes a trial court to order a permanent injunction based upon "harassment," and the trial court's grant of a permanent injunction in the present case was not an abuse of its discretion.

Circuit Court for Harford County,
Maryland
Case No. 12-C-12-001211
Argued: April 1, 2016

IN THE COURT OF APPEALS
OF MARYLAND

No. 76
September Term, 2015

STEPHEN SIEGLEIN

v.

LAURA SCHMIDT

Barbera, C.J.
*Battaglia
Greene
Adkins
McDonald
Watts
Rodowsky, Lawrence F.
(Retired, Specially
Assigned),
JJ.

Opinion by Battaglia, J.
Watts, J., concurs

Filed: May 20, 2016

*Battaglia, J., now retired, participated in the
hearing and conference of this case while an active
member of this court; after being recalled pursuant
to the Constitution, Article IV, Section 3A, she also
participated in the decision and adoption of this
opinion.

The primary issue we address in the present case is whether the use of the term "artificial insemination" in Section 1-206(b) of the Estates & Trusts Article of the Maryland Code[1] encompasses only a specific procreation technique of artificial insemination or whether the term more broadly encompasses any methodology wherein human reproduction is achieved by artificial means. The issue is queued up in this case, because Laura Schmidt, Respondent, wife of Stephen Sieglein, Petitioner, delivered a child through in vitro fertilization (IVF)[2] using donated sperm.

Mr. Sieglein, who the Circuit Court found to be the father of the child, was also determined to have voluntarily impoverished himself with respect to child support, as well as had injunctive relief entered against him based on harassment. He asks us to consider the following questions:

1. Whether the "plain meaning" of Md. Code Ann. 'ET' § 1-206(b) can be interpreted to include a case of "in vitro" fertilization from a donated egg and donated sperm, as a result of which Petitioner has been declared a

---

[1] Section 1-206 of the Estates and Trusts Article provides:
(a) A child born or conceived during a marriage is presumed to be the legitimate child of both spouses. Except as provided in § 1-207 of this subtitle, a child born at any time after his parents have participated in a marriage ceremony with each other, even if the marriage is invalid, is presumed to be the legitimate child of both parents.
(b) A child conceived by *artificial insemination* of a married woman with the consent of her husband is the legitimate child of both of them for all purposes. Consent of the husband is presumed.
Maryland Code (1974, 2011 Repl. Vol.).

[2] "In vitro fertilization (IVF) is a complex series of procedures used to treat fertility or genetic problems and assist with the conception of a child. During IVF, mature eggs are collected (retrieved) from ovaries and fertilized by sperm in a lab. Then the fertilized egg (embryo) or eggs are implanted in [the] uterus." The Mayo Clinic, www.mayoclinic.org, http://www.mayoclinic.org/tests-procedures/in-vitro-fertilization/basics/definition/prc-20018905 (https://perma.cc/5S87-R75M).

"parent" of the child and thereby liable for child support, even though the child has no genetic connection to either of the parties?

2. Whether the "plain meaning" of Md. Code Ann. 'FL' § 1-203(a)(2) can be interpreted to sustain a permanent injunction against Petitioner on the basis of "harassment"?

3. Whether the long settled meaning of "voluntary impoverishment" has been ignored by the decisions of the Courts below?

*Sieglein v. Schmidt*, 445 Md. 487, 128 A.3d 51 (2015).

We shall hold that the term "artificial insemination" in Section 1-206(b) of the Estates and Trusts Article encompasses in vitro fertilization utilizing donated sperm. We shall further hold that the Circuit Court Judge did not err in finding that Mr. Sieglein voluntarily impoverished himself nor in granting Ms. Schmidt's request for a permanent injunction.

The facts of this case are, for the most part, undisputed. Stephen Sieglein and Laura Schmidt were married in 2008 in Havre de Grace, Maryland and resided together in Abingdon until 2012. Prior to the marriage, Mr. Sieglein had one biological child, an adult, from a previous relationship, as did Ms. Schmidt. After the birth of his child Mr. Sieglein had undergone a vasectomy. Although Ms. Schmidt desired to have another child, Mr. Sieglein refused to have his vasectomy reversed. He did, however, accompany Ms. Schmidt to the Shady Grove Fertility Reproductive Science Center ("Shady Grove") as well as support the process of obtaining medical assistance to conceive a child.

Both Ms. Schmidt and Mr. Sieglein signed an "Assisted Reproduction: In Vitro Fertilization, Intracytoplasmic Sperm Injection, Assisted Hatching, and Embryo Freezing Consent" form in January of 2010. The form required both parties to indicate which

2

"elements of the IVF treatment you agree to undertake in your upcoming IVF treatment cycle." Ms. Schmidt and Mr. Sieglein agreed to undertake In Vitro Fertilization,[3] Intracytoplasmic Sperm Injection,[4] Assisted Hatching[5] and Embryo Cryopreservation.[6] Additionally, they both acknowledged by signature that they had been "fully advised of the purpose, risk and benefits" of the procedures to which they consented and were participating "free from pressure and coercion":

> I/We have been *fully advised of the purpose, risks and benefits of each of the procedures indicated above*, as well as Assisted Reproduction generally, and have been informed of the available alternatives and risks and benefits of such alternatives. This information has been supplemented by my/our consultation with my/our medical team. I/We have had the

---

[3] In vitro fertilization (IVF) is a procedure in which a physician will remove one or more eggs from the ovaries that are then fertilized by sperm inside the embryology laboratory. Shady Grove Fertility, www.shadygrovefertility.com, https://www.shadygrovefertility.com/treatments-success/advanced-treatments/in-vitro-fertilization-ivf. (https://perma.cc/ECE2-KGXQ).

[4] Intracytoplasmic sperm injection (ICSI) is performed as part of an in vitro fertilization (IVF) procedure if medically indicated. It is a process in which an embryologist injects a single sperm into the cytoplasm (center) of each egg. Shady Grove Fertility, www.shadygrovefertility.com, https://www.shadygrovefertility.com/treatments-success/advanced-treatments/in-vitro-fertilization-ivf/advanced-laboratory-technologies. (https://perma.cc/3PKJ-NSC7).

[5] Assisted hatching (AH) is a procedure performed prior to embryo transfer in selected cases. An embryo needs to escape or hatch from its protein shell—called the zona pellucida—before it can implant in the uterus. In AH, an embryologist uses a laser to dissolve part of the zona to facilitate the hatching process. Shady Grove Fertility, www.shadygrovefertility.com, https://www.shadygrovefertility.com/treatments-success/advanced-treatments/in-vitro-fertilization-ivf/advanced-laboratory-technologies. (https://perma.cc/3PKJ-NSC7).

[6] Also known as Frozen Embryo Transfer (FET), embryo cryopreservation involves freezing embryos through a process called vitrification. This process is done by placing the embryo into a solution and then rapidly freezing it in liquid nitrogen. Shady Grove Fertility, www.shadygrovefertility.com, https://www.shadygrovefertility.com/resources/educational-resources/articles/frozen-embryo-transfers-explained. (https://perma.cc/W4A3-SXTY).

opportunity to ask questions and all my/our questions have been answered to my/our satisfaction.

I/We have read the Assisted Reproduction document in its entirety and have had ample time to reach my/our decision, *free from pressure and coercion,* and agree to proceed with my/our participation in Assisted Reproduction services as stated above.

(emphasis added).

A son was born in 2012; his birth certificate listed Ms. Schmidt under the section for the mother's name and Mr. Sieglein under the section for the father's name. The parties separated shortly thereafter, however, and Ms. Schmidt filed a complaint in the Circuit Court for Harford County for a limited divorce on the grounds of cruelty and vicious conduct against her and her children, as well based upon voluntary separation; she also requested child support. Mr. Sieglein generally denied the allegations of the complaint as well as that he was the father of the boy; he, thereafter, filed a motion requesting that the court determine "whether or not [he was] a 'parent' as that term is employed and understood under Maryland law, so as to obligate him under [Ms. Schmidt's] claim for child support."

A hearing on Mr. Sieglein's motion and Ms. Schmidt's request for child support was held in the fall of 2012. Judge William Carr of the Circuit Court for Harford County issued a memorandum opinion and order in which he found that Mr. Sieglein was the parent of the child and, therefore, was obligated to pay child support:

[T]he Estates and Trusts Article unequivocally states that a child conceived via the artificial insemination of a married woman with the consent of her husband is the legitimate child of both spouses. Additionally, § 1-206(b) creates a presumption that a husband consented to the IVF process.

4

* * *

The facts the Defendant brings forth may demonstrate that he did not want to be a parent, but they do not rebut the presumption of consent to the IVF Treatment, and they do not show that he did not consent to creating a child. The Defendant married the Plaintiff in 2008. When the Plaintiff expressed a desire to have a child, the Defendant accompanied her to a fertility clinic to explore the IVF process, and they both signed the consent forms for the IVF treatment. The Defendant remained in the marital home with the Plaintiff throughout the pregnancy, and his name appears on the child's birth certificate as the father.

* * *

[T]he presumption in § 1-206(b) is that the Defendant consented to the artificial insemination process, making the child the legitimate child of the Defendant. . . . [He] jointly engaged in efforts with the Plaintiff to create a child, and it is in the best interest of the child to receive support and care from both parents.

(internal citations omitted). The court did not, however, determine the amount of the child support.

The parties appeared in December of 2012 before Judge Angela Eaves of the Circuit Court for Harford County for a *pendente lite* hearing on custody, visitation and child support. Prior to the hearing, Ms. Schmidt filed an amended complaint for limited divorce in which she sought sole legal custody of the boy, child support and injunctive relief under Section 1-203(a)(2) of the Family Law Article, which provides for the issuance of an injunction to "protect any party to the action from physical harm or harassment." Maryland Code (1974, 2012 Repl. Vol.), Section 1-203(a)(2) of the Family Law Article. In support of her amended complaint, Ms. Schmidt relied on a protective order issued by the District Court of Maryland for Harford County that ordered Mr.

5

Sieglein to vacate the family home, to cease harassment of Ms. Schmidt, to refrain from contacting Ms. Schmidt and to stay away from her place of employment.

During the December 2012 hearing, Mr. Sieglein attempted to re-litigate the issue of parentage and iterated that he did not seek custody or visitation. Judge Eaves, however, declined to revisit the issue of paternity, stating that Judge Carr had previously addressed that issue, having determined that Mr. Sieglein was one of the boy's parents. Judge Eaves, however, did make a determination that Mr. Sieglein, who was unemployed at the time of the hearing, had voluntarily impoverished himself,[7] based upon a number of factors:

> I am making a finding that he is voluntarily impoverished, first stating that he is not going to support [the child] in any way; second, from then having other assets and resources at his disposal that he has chosen to use only for his benefit, but not necessarily even in a way that's financially prudent.
>
> He has a renter that left . . . [h]e has that property available. He has a mortgage of $800, but he chooses to then spend $350 a month to live elsewhere. . . In this case, also the fact that he took out - - used funds from the money market account in order to only pay his own living expenses and not pay anything towards the child's expenses[.] Even though he could incur a penalty for early withdrawals of the IRA account, he still has some ability there, but he has chosen not to undertake any responsibility whatsoever with respect to this child[.]

Mr. Sieglein's potential income became the focal point of the child support calculation.[8]

In January of 2013 sole physical and legal custody of the boy was granted to Ms.

---

[7] Voluntary impoverishment "ask[s] whether [an individual's] current impoverishment is by his . . . own choice, intentionally, of his . . . own free will." *Wills v. Jones*, 340 Md. 480, 496, 667 A.2d 331, 338 (1995) (internal quotation omitted).

[8] Section 12-204 of the Family Law Article provides, in relevant part:

(continued . . .)

Schmidt, while Mr. Sieglein was ordered to pay monthly child support of $1049.00. An additional $100.00 per month was ordered to reduce Mr. Sieglein's child support arrearage of $7,171.00, covering the period from May 2012 to December 2012.

Ms. Schmidt was granted an absolute divorce in 2013. A final hearing to determine child support and to address her request for injunctive relief was held in February of 2014. At the hearing, Mr. Sieglein testified that he was a college graduate, had been an employee of Sysco Food Services until resigning in 2012 and was unemployed from mid November 2012 until December of 2013. He acknowledged that he was the former husband of Ms. Schmidt and had recently started working as a driver for a frozen food delivery service. Mr. Sieglein also testified that while unemployed he received unemployment benefits and additional income from a rental property he owned prior to the marriage.[9] Mr. Sieglein urged he had not voluntarily impoverished himself, but proffered evidence of his search for employment through copies of forms logging efforts to find work during his period of unemployment. Upon cross-examination, Mr.

---

(. . . continued)

> (b)(1) Except as provided in paragraph (2) of this subsection, if a parent is voluntarily impoverished, child support may be calculated based on a determination of potential income.
>
> (2) A determination of potential income may not be made for a parent who:
>
> > (i) is unable to work because of a physical or mental disability; or
> > (ii) is caring for a child under the age of 2 years for whom the parents are jointly and severally responsible.

Maryland Code (1989, 2012 Repl. Vol.).

[9] During testimony at the hearing Mr. Sieglein indicated that the monthly rent on the property was $1,150.00 prior to July of 2013 when it increased to $1,200.00.

Sieglein admitted to making 90 contacts during his twelve-month term of unemployment, several of which were repeated. He also testified that he had been employed for eight days in August 2013 as a trainee with Business Machines, but that his position was terminated after he had requested that the company enter a later start date to enable him to continue to receive unemployment because of unpaid training time.

Ms. Schmidt testified in support of her request for a permanent injunction to protect her from physical harm or harassment. She recounted several instances of Mr. Sieglein's circling around her, getting in line near her and approaching and intimidating her at the church attended by both of them, in violation of the protective order.

At the conclusion of the hearing, Judge Eaves determined, after considering Mr. Sieglein's physical condition, education, employment changes, relationship to Ms. Schmidt, efforts to find and retain employment and past work history, that Mr. Sieglein had voluntarily impoverished himself, she stated that, "There is an effort to not – to not maintain employment to the extent that he was employed with Sysco . . . a pattern of Mr. Sieglein not wanting to pay child support in this case for a child already determined to be his." She then calculated a child support payment from Mr. Sieglein to Ms. Schmidt of $1,007.00 monthly on behalf of the boy.

With respect to Ms. Schmidt's request for a permanent injunction, the court stated:

> [Mr. Sieglein's] credibility suffers with this Court. The manner in which he testifies, his ability only to recall events favorable to him in this case and the fact that he is less than honest in his dealings with respect to Ms. Schmidt. . . . Circling around her when he knows she is present . . . There is a protective order in place. Getting in line behind her when you know it is her means that you walk away because there is a protective order in place.

*  *  *

> I do think [Mr. Sieglein] is playing fast and loose with the Court's order in this matter and accordingly, I'm going to order him to stay 75 yards away from [Ms. Schmidt] and the children and to have no contact. No contact means not in person, by telephone, in writing or through third-parties in this case. And that will extend past the duration of the current protective order that is in effect.

Mr. Sieglein appealed to the Court of Special Appeals, which affirmed in a reported opinion, *Sieglein v. Schmidt*, 224 Md. App. 222, 227, 120 A.3d 790, 793 (2015).[10] The court, reviewing Section 1-206(b) of the Estates and Trusts Article, held that "a child conceived via artificial insemination or IVF with the consent of the parties and born during a marriage is the legitimate child of the marriage and legal parentage is established as to both spouses", *id.* at 243, 120 A.3d at 802, because:

> By enacting ET § 1-206(b), the General Assembly evinced its intention to acknowledge the role of medically assisted, non-traditional conception of a child in establishing a parent's rights and obligations.

*Id.* at 242, 120 A.3d at 802. The court further concluded that the circuit court had not abused its discretion in granting a permanent injunction to Ms. Schmidt nor in finding

---

[10] The Court of Special Appeals was presented with three questions:

> I. Did the Court below err in ruling that Appellant was the parent of a child conceived through 'in vitro' fertilization with a donated egg and donated sperm?

> II. Did the Court err and/or abuse her discretion in granting an Injunction against Appellant?

> III. Did the Court err and/or abuse her discretion in finding that Appellant was "voluntarily impoverished"?

Mr. Sieglein had voluntarily impoverished himself. *Sieglein*, 224 Md. App. at 246-52, 120 A.3d at 805-08.

The threshold question before us involves our interpretation of the term "artificial insemination" in Section 1-206(b) of the Estates and Trusts Article, which provides that:

> (a) A child born or conceived during a marriage is presumed to be the legitimate child of both spouses. Except as provided in § 1-207 of this subtitle, a child born at any time after his parents have participated in a marriage ceremony with each other, even if the marriage is invalid, is presumed to be the legitimate child of both parents.
>
> (b) A child conceived by *artificial insemination* of a married woman with the consent of her husband is the legitimate child of both of them for all purposes. Consent of the husband is presumed.

Maryland Code (1974, 2011 Repl. Vol.) (emphasis added).[11] We have often articulated the process of statutory interpretation as:

> In statutory interpretation, our primary goal is always to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by a particular provision, be it statutory, constitutional or part of the Rules. We begin our analysis by first looking to the normal, plain meaning of the language of the statute, reading the statute as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory. Further, an interpretation should be given to the statutory provisions that does not lead to absurd consequences. If the language of the statute is clear and unambiguous, we need not look beyond the statute's provisions and our analysis ends. If, however, the language is subject to more than one interpretation, or when the terms are ambiguous when it is part of a larger statutory scheme, it is ambiguous, and we endeavor to resolve that ambiguity by looking to the statute's legislative history, case law, statutory purpose, as well as the structure of the statute.

---

[11] All references to Section 1-206(b) of the Estates and Trusts Article throughout are to Maryland Code (1974, 2011 Repl. Vol.). The language of the Section has remained the same to the present day.

10

*Anderson v. Council of Unit Owners of Gables on Tuckerman Condominium*, 404 Md. 560, 571-72, 948 A.2d 11, 18-19 (2008) (internal citations omitted) (internal quotation omitted). Thus, our initial inquiry is whether the term "artificial insemination" in Section 1-206(b) is clear and unambiguous.

Mr. Sieglein argues that the term "artificial insemination" has a plain meaning that refers to only one procedure, specifically, that being intrauterine insemination.[12] He argues that in vitro fertilization, the procedure utilized in the present case, should be excluded from the definition because it was not a procedure known about in 1969, when the provisions of Section 1-206(b) were introduced into our statutory scheme. Ms. Schmidt argues, conversely, that the term "artificial insemination" relates to any "medical process" used to aid the woman in becoming pregnant "without sexual intercourse," as currently reflected not only in the Merriam-Webster Dictionary, www.merriam-webster.com, http://www.merriam-webster.com/dictionary/artificial%20insemination (https://perma.cc/ZT6D-VCDY), but also in Magill's Medical Guide, Magill's Medical Guide 231 (6th ed. Salem Health 2011), in which "artificial insemination" is under the collective heading of "Assisted Reproductive Technology."

The term "artificial insemination" is not defined anywhere in the Maryland Annotated Code. Past and present dictionary definitions abound regarding the term, in addition to Meriam-Webster's definition and the McGill Medical Guide. The 1961

---

[12] Intrauterine, or "artificial", insemination was defined, contemporaneously, as the "introduction of semen into the uterus or oviduct by other than natural means." Webster's Third New International Dictionary Unabridged, 124 (1961).

edition of Webster's Third New International Dictionary defined the term as the "introduction of semen into the uterus or oviduct by other than natural means." Webster's Third New International Dictionary Unabridged, 124 (1961). "Inseminate" in 1961 included two definitions; "to sow or sow in" and "to introduce semen into (the female genital tract) by coitus or by other means." Webster's Third New International Dictionary Unabridged, 1168 (1961).

Black's Medical Dictionary has provided that, "Artificial insemination is the introduction of semen into the vagina by artificial means." Black's Medical Dictionary, 65 (26th ed. 1965). Stedman's Medical Dictionary defines "artificial insemination" as the "introduction of semen into the vagina other than by coitus." Stedman's Medical Dictionary, 982 (28th ed. 2007).

In 1965, Black's Medical Dictionary, 65 (26th ed. 1965), recognized, "There are two forms of artificial insemination: AIH and AID. In AIH . . . the semen is obtained from the husband. In AID . . . the semen is obtained from a man other than the woman's husband." *See also* Ausman & Snyder's Medical Library, Lawyer's Edition, § 1:32 (1988) (Homologous Insemination refers to the use of the husband's sperm while Heterologous Insemination deals with the use of donated sperm). In addition, multiple techniques for introducing the sperm into the woman also have existed; intrafollicular, intraperitoneal, intratubal and intrauterine.[13]

---

[13] Intrafollicular insemination involves injecting the semen directly into an ovarian follicle. Intraperitoneal insemination injects the semen directly into the peritoneal cavity. Intratubal, or intrafallopian, insemination refers to the injection of washed semen into the

(continued . . .)

The term "artificial insemination", thus, had and continues to have a number of meanings, generally related to artificial reproduction. Though one meaning referred specifically to the placement of sperm in a woman's body, the term has sometimes been used more broadly to refer to assisted reproduction. As a result, Mr. Sieglein's contention that artificial insemination has a plain meaning which referred only to one specific reproductive technique is without merit.

Rather, by reference to the legislative history of Section 1-206(b) of the Estates and Trusts Article we can glean its legislative intent. The Section was added in 1969 to Article 93 entitled "Decedent's Estates", Chapter 3 of the Maryland Laws of 1969, in order to address the effect on legitimacy of the use of donated sperm.[14] The Report of the Commission to Review and Revise the Testamentary Law of Maryland ("Governor's Commission") commented on the addition of Section 1-206(b):

> Subsection (b) is new. It is derived from 2-111(b) (UPC). The Commission feels that this addition is desirable in view of the increased use of artificial insemination and the lack of any statute or case law on the subject in Maryland.

Second Report of the Governor's Commission to Review and Revise the Testamentary Law of Maryland, Article 93 Decedent's Estates 8 (Dec. 5, 1968). Although the Report did not define the term "artificial insemination", its reference to "2-111(b) (UPC)" was to

---

(. . . continued)

fallopian tube. Intrauterine insemination is a procedure by which specially washed sperm is injected through the cervix directly into the uterus. Dorland's Illustrated Medical Dictionary, 943 (32nd ed. 2012).

[14] Article 93 was recodified in 1974 as the Estates and Trusts Article. 1974 Maryland Laws, Chapter 11.

the 1967 draft of the Uniform Probate Code ("Draft UPC"), which proposed language for "Legitimacy; Effect of Illegitimacy on Intestate Succession." Third Working Draft Uniform Probate Code With Comments, National Conference of Commissioners on Uniform State Laws, 70-71 (Nov. 1967).

Section 2-111(b) of the Draft UPC provided:

Any child conceived following artificial insemination of a married woman with the consent of her husband shall be treated as their child for all purposes of intestate succession; consent of the husband is presumed unless the contrary is shown by clear and convincing evidence.

*Id.* at 70. The Comment to that Section stated that, "[the] section [was] designed to reflect the modern policy toward minimizing illegitimacy and its impact on inheritance rights, but with safeguards against abuse." *Id.* at 71. The Governor's Commission rewrote Section 2-11(b) using "indigenous" Maryland language, but closely followed the ideas expressed. The Uniform Probate Council, *Maryland Follows Uniform Probate Code*, 4 Real Prop. Prob. & Tr. J. 253 (1969).

By 1967, concern about the implications of the use of donated sperm in artificial insemination had arisen from a growing awareness that donated sperm separated the husband from the child, biologically, and raised the specter that the child could be regarded as illegitimate, as well as the wife as an adulteress. [15] *See* Allen D. Holloway,

---

[15] The use of the husband's, or non-donor, sperm in an artificial insemination procedure does not raise legitimacy concerns, as the biological link between the husband and child remains intact. *See* Allen D. Holloway, *Artificial Insemination: An Examination of the Legal Aspects*, 43 A.B.A. J. 1089, 1090 (1957) ("It is reasonably doubtful that any court would hold that the child born by artificial insemination through the use of the husband's semen, with his consent, would not be a legitimate child."); Elliott L. Biskind, *Legitimacy*

(continued . . .)

14

*Artificial Insemination: An Examination of the Legal Aspects*, 43 A.B.A.J. 1089, 1090 (1957) ("The second type of artificial insemination—using the semen of a donor—is the one which poses the grave questions.").

One of the "grave questions" was whether the injection of a third-party donor's semen into a married woman could be viewed as an act of adultery, as suggested in a Canadian case, *Orford v. Orford*, 58 D.L.R. 251 (1921), involving a child born to a woman who claimed to have been artificially inseminated while apart from her husband. *Id.* at 1091. Although the court did not believe the child was the result of artificial insemination, but, rather, was due to the woman's infidelity, the court opined, "Sexual intercourse [with a man not her husband] is adulterous because in the case of the woman it involves the possibility of introducing into the family of the husband a false strain of blood. Any act on the part of the wife which does that would therefore be adulterous." *Id.* at 1092. Condemnation of adultery, historically, thus, stemmed from its introduction of "spurious heirs" into the family, thereby redirecting the inheritance away from the husband's biologic children to those of a third party. George P. Smith, *Through a Test Tube Darkly: Artificial Insemination and the Law*, 67 Mich. L. Rev. 127, 134 (1968). As a result of the introduction of the "false strain of blood", the child could be deemed as illegitimate, unable to inherit from the husband's estate.

---

(. . . continued)
*of Children Born by Artificial Insemination*, 5 J. Fam. L. 39, 44 (1965) ("With respect to homologous insemination, there can be little, if any, quarrel with the assertion that children born as a result are legitimate.").

Adultery, and the injection of "bad blood" into the family, uprooted the long-held presumption that a child born during the marriage was legitimate, as the biologic offspring of the wife and her husband. *See* C. Thomas Dienes, *Artificial Donor Insemination: Perspectives on Legal and Social Change*, 54 Iowa L. Rev. 253, 279 (1968) ("It is universally recognized that a child born in wedlock is presumed legitimate."); Smith, 67 Mich. L. Rev. at 140 ("The presumption of a child's legitimacy is grounded in the English common-law concept that an offspring is deemed legitimate."). The presumption of legitimacy would be overcome, however, by a showing that the husband was impotent or absent at a time when conception could have occurred. Smith, 67 Mich. L. Rev. at 140. Proof that the wife was impregnated by artificial insemination with donor sperm, then, could overcome the presumption of legitimacy of a child born during a marriage. Holloway, 43 A.B.A.J. at 1092.

One viable alternative, it appeared, to establish legitimacy of a child born thorough artificial insemination with donated sperm was legislative action expressly legitimizing the child, although no state legislature had done so by 1957. *Id.* at 1156 (noting that Virginia, Wisconsin, Minnesota, New York and Indiana had contemplated such legislation, but no bills had moved beyond the committee stage). Commentators in the period immediately before the passage of Section 1-206(b), moreover, noted that "artificial insemination" was not an uncommon occurrence, as "it has been estimated that between 10,000 and 250,000 issue of artificial insemination live in the United States today [1968-69]. A.I.D. has, in fact, become so prevalent in this country that it is big business!" Smith, 67 Mich. L. Rev. at 133; *see also* Dienes, 54 Iowa L. Rev. at 255

("Estimates generally average about 150,000 living Americans born through AID, although some suggest the number may run to several hundred thousand.").

Commentary also included reflection on the use of donated sperm in artificial insemination, raising again the issue of adultery and questions regarding consent by a husband in order to legitimize the child and facilitate his or her inheritance rights. *See* Robert T. Jewett, *The Legal Consequences of Artificial Insemination in New York*, 19 Syracuse L. Rev. 1009, 1010 (1968) ("It is the introduction of the semen of a third party donor in the AID process which creates most of the legal difficulties[.]"). One commentator, noting that "[t]he trend [in 1965] [was] to narrow rather than enlarge the area in which children are labeled illegitimate[,]" argued that children born through artificial insemination with donated sperm and the consent of the husband should not be "stigmatized" with illegitimacy, particularly if the husband's name was registered as the father. Elliott L. Biskind, *Legitimacy of Children Born by Artificial Insemination*, 5 J. Fam. L. 39, 43 (1965). Others advocated for the introduction of a statutory solution to address the "problem [ ] raised by the expanding utilization and acceptance of artificial insemination". Harry D. Krause, *Bringing the Bastard into the Great Society—A Proposed Uniform Act on Legitimacy*, 44 Tex. L. Rev. 829, 845 (1966); *see also* Smith, 67 Mich. L. Rev. at 143 (commenting on the unfortunate failure of proposals attempting to legalize the use of artificial insemination with donated sperm).

As artificial reproduction developed and expanded to include in vitro fertilization, the same concerns regarding the use of donated sperm continued to be raised in the literature. *See* Emily McAllister, *Defining the Parent-Child Relationship in an Age of*

*Reproductive Technology" Implications for Inheritance*, 29 Real Prop. Prob. & Tr. J. 55 (1994); Helene S. Shapo, *Matters of Life and Death: Inheritance Consequences of Reproductive Technologies*, 25 Hofstra L. Rev. 1093 (1997). In IVF, the sperm is combined with mature eggs in a lab, and one or more fertilized eggs (embryos) may be introduced into the woman's uterus a few days later. American Congress of Obstetricians and Gynecologists, http://www.acog.org/ Patients/FAQs/Treating-Infertility (https://perma.cc/5KEG-Y6GQ).

Section 1-206(b) originated in the midst of concerns regarding the effect of the use of donated sperm in artificial reproduction on legitimacy and inheritance, rather than on whether a specific reproductive technique was used. Clearly, the statute engendered a statutory consent by a husband to legitimize a child born as a result of donated sperm, rather than as an emphasis on reproductive technique. This conclusion was presciently echoed by Emily McAllister in her discussion of early statutes confronting the use of artificial insemination, including Maryland's Section 1-206(b), when she stated, "There is a strong case for construing 'artificial insemination,' as used in [the Maryland statute], as encompassing other methods of assisted conception." McAllister, 29 Real Prop. Prob. & Tr. J. at 69. The basis for her conclusion rested in the conceptual similarity between artificial insemination and in vitro fertilization when donated semen is used; "the only "noteworthy difference between IVF . . . on the one hand and AID on the other is the fertilization site." *Id.*

As a result, we construe Section 1-206(b) to preserve the legitimacy of a child conceived through the use of donated sperm during an artificial reproductive technique,

18

other than surrogacy,[16] provided the husband consents to the procedure. The term "artificial insemination," then, in Section 1-206(b) of the Estates and Trusts Article encompasses in vitro fertilization, the reproductive technique used in the present case.

Mr. Sieglein further asserts, in support of his position that he is not the legal parent of the child and should not be obligated to pay child support, that *In re Roberto d.B.*, 399 Md. 267, 923 A.2d 115 (2007), established that the proper test to be applied in determining parentage is whether the parent is genetically related to the child, which he is not. Mr. Sieglein also points to our holding in *Knill v. Knill*, 306 Md. 527, 510 A.2d 546 (1986), in which we determined that a husband, whose wife had had a child by another man during the marriage yet treated the child as his own for twelve years, was not estopped from denying a duty to support the child.

*In re Roberto d.B.* involved a situation in which an unmarried father provided sperm that was combined with donated eggs and implanted into a gestational surrogate who was not the donor of the eggs nor married to the father. The process resulted in the birth of twins, and the surrogate's name was entered on the children's birth certificates. Neither the father nor the gestational surrogate wanted her name to appear on the birth certificate as the child's mother, as no relationship was intended between the children and the surrogate. The circuit court ruled that a trial court did not have the power to remove the surrogate's name and that it would not be in the children's best interests were it to do so.

---

[16] We leave for another day whether the term "artificial insemination" in Section 1-206(b) includes gestational surrogacy.

The primary issue before us, then, was whether the gestational surrogate's name could be removed from the children's birth certificates as mother under Section 5-1002 of the Family Law Article, part of the paternity statute, which was enacted to provide support for children "born out of wedlock." 399 Md. at 279, 923 A.2d at 122, quoting Section 5-1002 of the Family Law Article. The paternity statute, however, provided only that a declaration of paternity could be set aside, without reference to the maternity of the woman who bore the child. Section 5-1038 of the Family Law Article provided, in relevant part, that:

> (a)(1) Except as provided in paragraph (2) of this subsection, a declaration of paternity in an order is final.

> (2)(i) A declaration of paternity may be modified or set aside:

> * * *

> 2. if a blood or genetic test done in accordance with § 5-1029 of this subtitle establishes the exclusion of the individual named as the father in the order.

Maryland Code (2012 Repl. Vol.), Section 5-1038 of the Family Law Article. "Thus, the court has the power to declare that an alleged father has no paternal status when no genetic connection is found." 399 Md. at 277, 923 A.2d at 121.

After establishing that under Maryland law a trial court was, in fact, authorized to order the removal of the mother's name from a birth certificate, we permitted the gestational surrogate's name to be removed, because we interpreted the statute to "extend the same rights to women and maternity as it applies . . . to men and paternity." *Id.* at 284, 923 A.2d at 125. While we acknowledged that, based on the language of the

20

statute,[17] "the Legislature did not contemplate anything outside of traditional childbirth. . . . [and] [t]he statute does not provide for . . . a situation where children are conceived using an assisted reproductive technology," *id.* at 279, 923 A.2d at 122, we "construed the statute to apply equally to both males and females." *Id.* at 283, 923 A.2d at 124-25. As such, under the applicable terms of the statute, the gestational surrogate could challenge the imposition of maternity on the basis of not having a biological connection to the children.

While Section 5-1038 provides a mechanism for the exclusion of a father, as well as a gestational mother, as a parent, Section 1-206(b), in play in the present case, specifies that the child born of artificial insemination is the legitimate child of both the mother and the husband when the husband, such as Mr. Sieglein, has consented to the artificial reproduction procedure and the child was born during the marriage.

Mr. Sieglein also relies on *Knill*, 306 Md. at 527, 510 A.2d at 546, in which a husband denied, during a divorce action, his obligation to support a boy, born during the marriage, but who was not his biologic child. The husband provided financial support for the boy until his wife sued for divorce.

At the divorce hearing, the husband argued that he had no obligation to support the boy, because his relationship with the child was solely based on a voluntary act on his

---

[17] Our reference was to Section 5-1027 of the Family Law Article, which provided then, as it does now, in relevant part:

> (c)(1) There is a rebuttable presumption that the child is the legitimate child of the man to whom its mother was married at the time of conception.

Maryland Code (2012 Repl. Vol.), Section 5-1027(c)(1) of the Family Law Article; *In re Roberto d.B.*, 399 Md. 267, 279, 923 A.2d 115, 122 (2007).

part, rather than a legal obligation. The trial court concluded that the husband was equitably estopped from denying his obligation to support the child. The husband appealed, and we issued a writ of certiorari before argument in the Court of Special Appeals.

We noted that Section 5-203(b)(1) of the Family Law Article provides that, "The parents of a minor child are jointly and severally responsible for the child's support. . . ." *Id.*, 306 Md. at 531, 510 A.2d at 548, quoting Maryland Code (1984), Section 5-203(b)(1) of the Family Law Article. "[P]arents of a minor child" in the statute referred to natural and adoptive parents. *Id.*, citing Maryland Code (1984), Section 5-308(b) of the Family Law Article.

We concluded that the evidence presented at trial did not support the inference that the wife had foregone her opportunity to seek child support from the natural father as a result of the husband's voluntary support and that the wife could still bring a paternity action against the natural father. Thus, "we believe[d] that [the husband] should not be penalized for his conduct under the circumstances as described[, and] . . . [held] that [the husband was] not equitably estopped to deny a duty to support." *Id.* at 539, 510 A.2d 552.

In the present case, the boy born during Mr. Sieglein's and Ms. Schmidt's marriage resulted from an artificial insemination procedure to which Mr. Sieglein consented. Unlike *Knill*, where the child was born as a result of the wife's infidelity and voluntarily supported by the husband, Mr. Sieglein consented to the use of artificial insemination and, under Section 1-206(b), is the father of the child.

22

Because we have determined that Mr. Sieglein is the father of the child under Section 1-206(b) of the Estates and Trusts Article, we now turn to the other two questions he presents. Mr. Sieglein first contends that the Circuit Court ignored the traditional meaning of "voluntary impoverishment" when it found he had voluntarily impoverished himself, and based the child support payment on his potential income.

Section 12-204(b) of the Family Law Article provides for imputation of "potential" income when the "parent is voluntarily impoverished," but does not define voluntary impoverishment. [18] Review of the legislative history in 1989 of Senate Bill 49 indicates that the term "voluntarily impoverished" in the final version of Section 12-204(b) replaced earlier proposed language of "voluntarily unemployed or underemployed."[19]

We had acknowledged the importance of earning capacity two decades earlier in *Pet v. Pet*, 238 Md. 492, 497, 209 A.2d 572, 574 (1965), in an alimony context: "The rule

---

[18] Section 12-204(b) of the Family Law Article provides:

> (b)(1) Except as provided in paragraph (2) of this subsection, if a parent is voluntarily impoverished, child support may be calculated based on a determination of potential income.

> (2) A determination of potential income may not be made for a parent who:
>     (i) is unable to work because of a physical or mental disability; or
>     (ii) is caring for a child under the age of 2 years for whom the parents are jointly and severally responsible.

Maryland Code (1989, 2012 Repl. Vol.), Section 12-204(b) of the Family Law Article.

[19] A similar change was made, prior to enactment, to the definition of "income" in Section 12-201, replacing "unemployed or underemployed" with the term "voluntarily impoverished" as the trigger for basing a parent's income on their potential, rather than actual income.

of this Court . . . is that an award of alimony is to be based on the earning capacity and financial worth of the husband at the time of trial." We expanded the notion to child support payments in *Chalkley v. Chalkley*, 240 Md. 743, 744, 215 A.2d 807, 808 (1966) ("Ordinarily, the awarding of alimony and support should be based on the earning capacity and financial worth of the husband and father and the circumstances of the wife and children as of the time of the award."). As a seminal matter, therefore, inclusion of the term "voluntarily impoverished" anticipated voluntary unemployment or underemployment.

Within a few years after the enactment of the statute, the Court of Special Appeals, in *Goldberger v. Goldberger*, 96 Md. App. 313, 327, 624 A.2d 1328, 1335, *cert. denied*, 332 Md. 453 (1993), recognized voluntary impoverishment as rendering oneself voluntarily without adequate resources:

> [A] parent shall be considered "voluntarily impoverished" whenever the parent has made the free and conscious choice, not compelled by factors beyond his or her control, to render himself or herself without adequate resources.

The court's characterization of voluntary impoverishment was based partly on the fact that it recognized that the issue had arisen most often when "a parent reduce[d] his or her level of income to avoid paying support by quitting, retiring, or changing jobs." *Id.* at 326, 624 A.2d at 1335. The traditional notion of voluntary impoverishment, thus, contemplated whether a parent had intentionally acted to reduce their income in an effort to minimize, or eliminate, their child support obligation. *Id.* at 327, 624 A.2d at 1335. To aid in its determination of whether a parent had freely and voluntary impoverished

24

himself, the intermediate appellate court in *Goldberger* reiterated the factors to be considered:

1. his or her current physical condition;

2. his or her respective level of education;

3. the timing of any change in employment or financial circumstances relative to the divorce proceedings;

4. the relationship of the parties prior to the divorce proceedings;

5. his or her efforts to find and retain employment;

6. his or her efforts to secure retraining if that is needed;

7. whether he or she has ever withheld support;

8. his or her past work history;

9. the area in which the parties live and the status of the job market there; and

10. any other considerations presented by either party.

*Id.*

In *Wills v. Jones*, 340 Md. 480, 485, 667 A.2d 331, 333 (1995), we recognized that "[t]he meaning of 'voluntary impoverishment' [in Section 12-204(b) had] not been previously addressed by this Court," but we determined that whether a parent is "voluntarily impoverished," under the traditional notion as expressed in *Goldberger*, requires the court to "inquire as to the parent's motivations and intentions." *Id.* at 489, 667 A.2d at 335. We also recognized in *Wills* that the pivotal issue was whether the parent had voluntarily impoverished himself, not whether he had done so in order to avoid child support:

In determining whether a parent is voluntarily impoverished, the question is whether a parent's impoverishment is voluntary, not whether the parent has voluntarily avoided paying child support. The parent's intention regarding support payments, therefore, is irrelevant. It is true that parents who impoverish themselves "with the intention of avoiding child support . . . obligations" are voluntarily impoverished. But, as the court recognized in *Goldberger* . . . a parent who has become impoverished by choice is "voluntarily impoverished" regardless of the parent's intent regarding his or her child support obligations.

340 Md. at 494, 667 A.2d at 338 (internal citations omitted) (emphasis omitted).

Unlike what Mr. Sieglein alleges, in the present case the circuit court judge applied the traditional notion of voluntary impoverishment when she utilized the *Goldberger* factors in order to determine whether Mr. Sieglein was avoiding employment or was underemployed:

[T]he Court has to consider the individual's current physical condition, prospective level of education, the timing of any change in employment for financial circumstances relative to the proceedings, the relationship of the parties prior to the proceedings, efforts to find an retain employment, efforts to secure retraining, if that is needed, whether they have ever withheld support, any relevant past work history, the areas in which the parties live, and the status of the job market and any other considerations presented by either party.

Judge Eaves specifically found that Mr. Sieglein was in good health and that nothing precluded him from being employed. The Judge also noted that he had sufficient education to work in a managerial capacity. Characterizing the relationship between Mr. Sieglein and Ms. Schmidt as acrimonious, the Judge stated that "[n]either one wants to have anything to do with the other." Regarding Mr. Sieglein's efforts to find and retain employment to the extent he had been employed with Sysco, the Judge concluded that his effort was insufficient. Although he had made efforts at finding employment, Judge

26

Eaves determined that his repetitive contact with the same employers over a short period of time and his attempt to have Business Machines postdate the start of his employment constituted a lack of effort based upon his own actions. The Judge further explained that the area in which the parties lived and the job market overall were not a problem in this case. Mr. Sieglein's work history indicated that he had been steadily employed for 12 years with Sysco, and the testimony provided no reason for him to have left that position. Based upon its findings, the Circuit Court found Mr. Sieglein to be voluntarily impoverished and imputed an income of $4,052.00 per month, which we affirm.

We finally turn to the issue of whether Section 1-203(a) of the Family Law Article supports the Circuit Court's issuance of a permanent injunction to Ms. Schmidt against Mr. Sieglein for "harassment." Section 1-203(a) provides:

> (a) In an action for alimony, annulment, or divorce, an equity court:
>
> (1) has all the powers of a court of equity; and
>
> (2) may issue an injunction to protect any party to the action from physical harm or *harassment*.

Maryland Code (2012 Repl. Vol.), Section 1-203 of the Family Law Article (emphasis added). We "review a trial court's determination to grant or deny injunctive relief for an abuse of discretion because trial courts, sitting as courts of equity, are granted broad discretionary authority to issue equitable relief." *State Com'n on Human Relations v. Talbot County Detention Center*, 370 Md. 115, 127, 803 A.2d 527, 534 (2002).

Mr. Sieglein asserts that the circuit court's grant of the permanent injunction by its February 2014 order was improper based on the evidence presented, even when taken in

27

a light most favorable to Ms. Schmidt and, therefore, was an abuse of the court's discretion. He posits that the allegations of harassment made by Ms. Schmidt amounted only to "bare assertions of unrelated happenstance encounters" and did not meet the requisite threshold for an injunction. In support, Mr. Sieglein points to the Court of Special Appeals's opinion in *Cote v. Cote*, 89 Md. App. 729, 735, 599 A.2d 869, 872 (1992), in which the court affirmed the entry of an interlocutory injunction barring the husband from the marital home, based on the risk of "irreparable injury" to the wife should the injunction be denied, a risk Mr. Sieglein contends is not present in this case. Mr. Sieglein bolsters his argument against the permanent injunction by referring to a comment included in *Cote* to the effect that: "The trial judge stated that the injunction would 'remain in full force and effect until further Order of the Court.' Therein lies our concern. This injunction has been in force well over a year and no further order of the court has been forthcoming." *Id.* at 739, 599 A.2d at 874.

Section 1-203(a) of the Family Law Article finds its origins in Section 3-603(b) of the Courts and Judicial Proceedings Article. Maryland Code (1974, 1977 Supp.). Section 3-603(b) provided:

> A court of equity sitting in an action for divorce, alimony, or annulment, in addition to exercising all the powers of a court of equity, may issue an injunction to protect any party to the action from physical harm or harassment.

Maryland Code (1974, 1977 Supp.). We had occasion to review Section 3-603(b) shortly after it was enacted and the trial court's authority to issue an injunction. *Winston v.*

*Winston*, 290 Md. 641, 431 A.2d 1330 (1981). In *Winston,* we reversed the trial court's

denial of an injunction, stating:

> . . . [T]he General Assembly was unambiguously endowing the equity court sitting in divorce, alimony and annulment proceedings with all the general powers normally exercised by that court in other matters. In addition, the enactment specifies that this authority is extended so as to encompass the right to enjoin a party in domestic relations proceedings from physically harming or harassing another party.

*Id.* at 648, 431 A.2d at 1333. Chapter 296 of the 1984 Maryland Laws recodified Section

3-603(b) as Section 1-203(a) of the Family Law Article. Maryland Code (1984).

In *Galloway v. State*, 365 Md. 599, 627-28, 781 A.2d 851, 867-68 (2001), we

defined harassment as:

> We agree with the reasoning of the Court of Special Appeals in *Caldwell v. State*, *supra*, and with those states finding that the terms "annoy," "alarm," and "harass" are commonly understood by ordinary people and, as such, provide fair notice to potential offenders and adequate guidance for enforcement. The definition of "annoy" is "to disturb or irritate especially by repeated acts." An alternative definition for annoy is "to *harass* especially by quick brief attacks." The definition of alarm is "to strike with fear." The applicable definition of harass is "to annoy persistently."

(internal citations omitted). Section 1-203(a) of the Family Law Article embodies this

definition of harassment and encompasses behavior that persistently annoys another or

disturbs another through repeated acts, such as what Judge Eaves found here to be:

> Circling around her when he knows that she is present means avoid her. There is a protective order in place. Getting in line behind her when you know it is her means that you walk away because there is a protective order in place. . . . [T]he reasonableness of fear is to be determined from the perspective of the person experiencing it. And that is Ms. Schmidt in this case. . . . There isn't any reason Mr. Sieglein needs to be in the presence of Ms. Schmidt in the direct, immediate or proximate presence of Ms. Schmidt and the children in this case.

That harassment could constitute irreparable injury in the present case is supported by the findings. *C.f. El Bey v. Moorish Science Temple of America, Inc.*, 362 Md. 339, 355-56, 765 A.2d 132, 140-141 (2001).

Our conclusion that the trial court judge did not abuse her discretion in entering a permanent injunction against Mr. Sieglein for harassment is supported by *Cote*, in which the Court of Special Appeals reviewed a circuit court's issuance of an injunction pursuant to Section 1-203(a)(2). 89 Md. App. at 729, 599 A.2d at 869. In that case, the husband filed for divorce and, on the same day, the wife filed a petition for a protective order citing domestic violence, which was granted after a hearing and barred the husband from entering the family home. *Id.* at 731, 599 A.2d 870. Shortly thereafter, the wife moved for an *ex parte* injunction to bar her husband from the home. Evidence introduced at the hearing for the injunction indicated harassment from both parties, which included "going into each other's cars, going to each other's residences, and making harassing telephone calls." *Id.* at 732, 599 A.2d at 871.

The Court of Special Appeals, citing two elements necessary for injunctive relief—irreparable injury from a denial of the injunction and retention of the court's ability to grant relief in the divorce action—determined that "a risk of irreparable injury that could occur, namely, future physical abuse of and by both parties" was present and that "the injunction prevented both parties from going to or entering each other's residences; it in no way compromised the court's ability to grant complete relief in the divorce action." *Cote*, 89 Md. App. at 735, 599 A.2d at 872. As such, the intermediate appellate court held that the trial court had not abused its discretion when it issued the

injunction barring the husband from the home. *Id.* at 737, 599 A.2d at 873. The concern

of the court regarding the length of the injunction in *Cote* has no bearing on the present

case in which a permanent injunction was appropriately entered.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONER.**

Circuit Court for Harford County
Case No. 12-C-12-001211

Argued: April 1, 2016

IN THE COURT OF APPEALS

OF MARYLAND

No. 76

September Term, 2015

—————————————————————

STEPHEN SIEGLEIN

v.

LAURA SCHMIDT

—————————————————————

Barbera, C.J.
*Battaglia
Greene
Adkins
McDonald
Watts
Rodowsky, Lawrence F. (Retired,
Specially Assigned)

JJ.

—————————————————————

Concurring Opinion by Watts, J.

—————————————————————

Filed: May 20, 2016

*Battaglia, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, she also participated in the decision and adoption of the majority opinion.

Respectfully, I concur.[1]   I would affirm the Court of Special Appeals's determination that the child is the legitimate child of Stephen Sieglein ("Sieglein"), Petitioner, and Laura Schmidt ("Schmidt"), Respondent, and that both Sieglein and Schmidt are the child's legal parents.  I would not hold, however, that Md. Code Ann., Est. & Trusts (1974, 2011 Repl. Vol.) ("ET") § 1-206(b)'s reference to "artificial insemination" includes the circumstance where a child is conceived through in vitro fertilization ("IVF") using a donated egg and donated sperm, *i.e.*, that artificial insemination includes IVF.  I think that the Court need not make this determination.  Instead, I would hold that ET § 1-206(a) applies to the circumstances of this case, and that an individual may be declared a parent pursuant to ET § 1-206(a) where a child is conceived during the marriage, and with the consent of both parties, through IVF using a donated egg and donated sperm, and where the individual has failed to present good cause sufficient to rebut the statutory presumption of legitimacy.  Rather than judicially interpreting ET § 1-206(b)'s definition of artificial insemination, I would commend the matter to the General Assembly to determine whether ET § 1-206(b), a statute that was enacted before the existence of IVF, should be amended in light of numerous advances in reproductive medicine.

As an initial matter, I would conclude that, because this case involves a child who

---

[1] I agree with the Majority that the Circuit Court for Harford County ("the circuit court") was correct in concluding that Stephen Sieglein ("Sieglein"), Petitioner, was voluntarily impoverished under Md. Code Ann., Fam. Law (1984, 2012 Repl. Vol.) ("FL") § 12-204(b) and in imputing potential income to Sieglein for purposes of calculating his child support obligations, see Maj. Slip Op. at 27, and that the circuit court did not abuse its discretion in granting a permanent injunction to Laura Schmidt, Respondent, pursuant to FL § 1-203, see Maj. Slip Op. at 30-31.

was born during Sieglein's and Schmidt's marriage, the statutes in Subtitle 10 (Paternity Proceedings) of Title 5 (Children) of the Family Law Article do not apply. As Md. Code Ann., Fam. Law (1984, 2012 Repl. Vol.) ("FL") § 5-1002(b) makes clear, the purpose of Subtitle 10 is, among other things, "to promote the general welfare and best interests of **children born out of wedlock**" and "to impose on the mothers and fathers of **children born out of wedlock** the basic obligations and responsibilities of parenthood[.]" (Emphasis added). See also Evans v. Wilson, 382 Md. 614, 634, 856 A.2d 679, 691 (2004) ("[O]ne of the purposes of the paternity act is to promote the general welfare and best interests of children born *out of wedlock*." (Citation and internal quotation marks omitted) (emphasis in original)). In any event, even within Subtitle 10 is a presumption of legitimacy. Specifically, FL § 5-1027(c)(1) provides: "There is a rebuttable presumption that the child is the legitimate child of the man to whom its mother was married at the time of conception."

Rather, because the child was born during the marriage, ET § 1-206 applies. This Court has explained that "an action to establish paternity is more appropriately brought under the Estates & Trusts Article when the child at issue has been born during a marriage." Evans, 382 Md. at 627-28, 856 A.2d at 687 (citation and internal quotation marks omitted). Indeed, "where a child is presumed legitimate[,] and where two men each acknowledge paternity of that child, the procedure for considering the issue of paternity under the Estates and Trusts Article is preferable because it presents the more satisfactory and less traumatic means of establishing paternity." Id. at 628, 856 A.2d at 687 (citations and internal quotation marks omitted). To be sure, this is not a case in which two men are claiming

paternity of a child born during a marriage. However, because the child was born during the marriage and not out of wedlock, I would conclude as an initial matter that ET § 1-206 is the statute that governs in this case.

ET § 1-206, concerning the presumption of legitimacy, provides, in its entirety, as follows:

> (a) Marriage of parents. – A child born or conceived during a marriage is presumed to be the legitimate child of both spouses. Except as provided in [ET] § 1-207 . . . , a child born at any time after his parents have participated in a marriage ceremony with each other, even if the marriage is invalid, is presumed to be the legitimate child of both parents.
>
> (b) Artificial insemination. – A child conceived by artificial insemination of a married woman with the consent of her husband is the legitimate child of both of them for all purposes. Consent of the husband is presumed.

Thus, ET § 1-206(a) creates a statutory presumption of legitimacy for children who are born to a married mother. And, ET § 1-206(b) extends that presumption of legitimacy to children who are conceived by artificial insemination of a married mother with the consent of her husband. As this Court explained in Evans, 382 Md. at 629, 856 A.2d at 688, "a blood or genetic test may be ordered only upon a showing of good cause" sufficient to overcome the statutory presumption of legitimacy under ET § 1-206, and, in "making the determination of good cause, the [trial] court must weigh the various interests of the parties and, in particular, consider whether blood or genetic testing would be in the best interests of" the child. In any event, in my view, there is no need even to consider whether ET § 1-206(b) includes children who are conceived through IVF as opposed to artificial insemination because ET § 1-206(a) applies in the first instance.

Importantly, in my view, Sieglein has not presented any evidence to rebut ET § 1-

206(a)'s presumption of legitimacy. Indeed, absent evidence of fraud or duress, no parent who voluntarily consented to the use of IVF with an anonymous donor to conceive a child during marriage could overcome the presumption of legitimacy that is established by ET § 1-206(a). For example, in this case, Sieglein has not alleged that Schmidt acted unilaterally in undergoing IVF, or that his signature on the consent form with the Shady Grove Fertility Reproductive Science Center was forged or made under duress. Indeed, by all accounts, the record reveals that Sieglein was an active participant in the couple's decision to pursue IVF. And, once the child was conceived and born, Sieglein was identified on the child's birth certificate as the child's father, and Sieglein participated in the care of the child immediately following the child's birth. Sieglein has not alleged that his participation was involuntary, or that his consent was obtained by any manner of fraud or coercion. The donor process was anonymous, and there is no other putative father who contests the child's parentage. Thus, I would have no difficulty in concluding that, under ET § 1-206(a)'s plain language, Sieglein is the parent of the child who was conceived during the marriage, with the consent of both parties, through IVF using a donated egg and anonymously donated sperm, where Sieglein has failed to present good cause to rebut the statutory presumption of legitimacy.

To conclude otherwise—that a child who is conceived during a marriage and with the consent of both parties through IVF using a donated egg and donated sperm is not presumed to be the legitimate child of both spouses—would be contrary to the statutory presumption of legitimacy. This simply could not have been the General Assembly's intent. Rather, by enacting ET § 1-206(a)'s predecessor in 1969, the General Assembly

clearly and unequivocally demonstrated an intent to extend a statutory presumption of legitimacy to children who are born or conceived during a marriage. Accordingly, I would hold that, under ET § 1-206(a), because the child was conceived and born during Sieglein's and Schmidt's marriage, the presumption of legitimacy applies, the child is presumed to be the child of both Sieglein and Schmidt, and the presumption has not been rebutted. In other words, Sieglein is the child's father and legal parent, and thus is "jointly and severally responsible for the child's support, care, nurture, welfare, and education" under FL § 5-203. Because I would resolve this case through application of ET § 1-206(a), I would refrain from engaging in an analysis of whether ET § 1-206(b)'s reference to "artificial insemination" includes IVF. Recognizing that IVF did not exist at the time that ET § 1-206(b) was enacted and that this circumstance casts serious doubt on the General Assembly's intent to have artificial insemination include IVF and other advances in reproductive medicine, I would refer the matter of amending the decades-old statute to the General Assembly for its consideration.

For the above reasons, respectfully, I concur.